# UNITED STATES DISTRICT COURT

### FOR THE

## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

FILED

MAY 2 0 2019

CLERK, US DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| **SHANNON KEENAN GREENE** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| -v- ) | **Case No.: 2:19CV150** |
| ) | |
| **CITY OF VIRGINIA BEACH** ) | **Jury Trial ☒YES ☐NO** |
| ) | |
| ) | |
| ) | |
| *Defendant*. ) | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

- **The Parties to this complaint**
  **The Plaintiff**
   Shannon K.Greene
  4909 Ruth Rd.
  Virginia Beach, VA 23464
  757-561-0286

  **The Defendant**
  City of Virginia Beach
  Building 1
  2401 Courthouse Drive
  Virginia Beach, VA 23456
   757-385-3111

- **Basis for Jurisdiction**

This action is brought pursuant to

Title VII of the Civil Rights Act of 1964, 42 U.S.Code § 2000e- 2(a) ("Title VII") and the
Discrimination in Employment Act, 29 U.S.Code § 623(a)(1) ("ADEA")  and the

Occupational Safety and Health Act of 1970 ("OSH Act") 42 U.S. Code § 2021 and

42 U.S. Code  1981 Equal rights under the law ("42 USC 1981") and

18 U.S.C. § 241 Conspiracy against rights ("18 USC 241")  and the

Equal Pay Act Amendment 29 Code § 206 (d) ("Equal Pay Act") of the Fair Labor Standards
Act of 1938 29 Code § 201-219 and the

Americans with Disabilities Act of 1990 ("ADA") 42 U.S. Code § 12101 and the

Freedom of Information Act of 1977 5 U.S.Code § 552 as amended and

Laws regarding libel and slander, including imputation of diseases, lack of chastity, and
criminality

This Court has subject matter jurisdiction over this matter pursuant to 28 US Code § 1331.

This Court has personal jurisdiction: the City of Virginia Beach is in Virginia and the plaintiff is

a U.S. citizen.

Venue is correct pursuant to 28 US Code §1391(b) because the events outlined in this complaint occurred in this district.

## Introduction

Shannon Greene is an employee of the City of Virginia Beach. Ms Greene has been subjected to a hostile and violent  work environment based on sex discrimination; ongoing discrimination and retaliation for opposing sexual harassment; unequal terms and conditions of employment based on sex; disparate policy enforcement singling out Ms Greene, disparate terms of employment, disparate pay based on sex for City-sponsored training, numerous Human Resources "mistakes" all disadvantageous to Ms Greene; threats and intimidation; financial punishment and financial threats based on sex; an illegal background investigation with regard to in-depth and probing sexual investigation; sexual humiliation in the form of distributed materials; failure to hire based on sex; failure to promote based on sex; age-discriminatory comments; employer surveillance based on sex;  libel, and job termination, among other illegal acts. Ms Greene was stripped of all basic dignity based on her sex, was treated as a second-class citizen based on sex, was violently threatened, was insulted and shouted at; and was not permitted certain protections including protection from sexual harassment, retaliation, and workplace violence. Ms Greene was assaulted and battered based on sex: kicked while injured, kicked again in her knee, choked, punched, threatened with closed fists, threatened with banging on her car while Ms Greene was inside, and specifically targeted in a reckless endangerment incident involving a rat trap that is illegal in Virginia. Denied of basic rights under 42 USC § 1981 and 18 U.S.C. § 241 and basic safety under the OSH Act, as well as Title VII, ADEA, and other violations, Ms Greene lived and lives in very real danger in her work place.

In the paragraph above, "based on sex" includes both sex discrimination by the City of VB and discrimination based on opposing unlawful sex discrimination by the City of VB.

Quid pro quo sex discrimination also occurred, including the fact that a City HR employee; a City Manager; and a VBPD police officer all told Ms Greene when she was a VBPD applicant that she would never work for the VBPD if she makes a report to the EEOC regarding sex discrimination. The quid pro quo comes into play in the instruction to Ms Greene that you have to accept sex discrimination and relinquish EEOC rights if you want to be a VBPD applicant. In the case of the HR officer, the quid pro quo was not simply "advice" but was stated by someone (Stacy Hawks) who had the power to terminate Ms Greene's application based on Ms Greene's opposition to sex discrimination, and in fact not only threatened this but after the threat was made, went ahead and did terminate Ms Greene's VBPD application for the explicitly stated reason (in writing) of Ms Greene's opposition to sex discrimination.

On 3-22-2019, City of VB representative Mr John Cliff Myers was testifying at a grievance hearing initiated by a person other than Ms Greene when one of the panel investigators asked Mr Myers a question about Ms Greene. Mr Myers conceded under oath and while audio recorded that a hostile work environment for Ms Greene including assaults and battery ensued after Ms Greene's dept. became aware that Ms Greene reported gender-based harassment at her work place, approximately 6 weeks after she began her City employment in 2015.

## Timeliness

In accordance with the principle of equitable tolling (statutes of limitations do not bar a claim when the plaintiff, despite reasonable care and diligent efforts, did not immediately discover the injury; applied to Ttle VII by the US Supreme Court in Zipes v Trans World Airlines), some of the above illegal acts by the City of Virginia Beach ("City of VB" or "City") were not immediately apparent in their effects. For example, Ms Greene was "blackballed" or blacklisted by the Human Resources Dept. after she submitted a charge or grievance regarding sexual harassment and retaliation; however, she did not know she was blacklisted immediately; as she gradually received 0 out of 13 jobs (City transfers) that she applied for, and the reasons for denial given by the City of VB were pretextual and false, and the HR dept. made other errors, all disadvantageous to Ms Greene, the blackballing became apparent. Also under the principle of equitable tolling, Ms Greene's background investigation report (pre-employment inquiry) by the Virginia Beach Police Dept. (VBPD), which contained sexual material collected by the author; fictional sexual scenarios about Ms Greene; sexual innuendo by the author of the report; and a conclusion that Ms Greene was unhire-able based on her opposition to sexual harassment at the City of VB, became an illegal reason to dismiss Ms Greene that unfolded and became apparent over a 12-month period in which multiple attempts were made by HR and the VBPD to fire Ms Greene from the VBPD based on false and pretextual grounds, despite the fact that Ms Greene was qualified and recommended by the Police Officers who interviewed her.

The EEOC has already expressed in two documents (Exhibit 1 #right to sue  and Exhibit 2 #EEOC timely claim) the timeliness of all these charges. In addition, the principle of equitable tolling with regard to time limits; EEOC time limit exceptions for reporting based on Ongoing Harassment; and EEOC time limit exceptions for reporting Ongoing Retaliation all apply, and all events 2015 to present are actionable.

- **Exhaustion of Federal Administrative Remedies**

  - I filed a charge on 10-26-2017 with the Equal Employment Opportunity Commission (EEOC) regarding the defendant's ongoing discriminatory conduct. My charge was re-written by the EEOC in their wording and filed by their office on 2-5-2018. One of my charges in the intake questionnaire (my original charge) was Ongoing Retaliation,

meaning that no events relevant to retaliation (2015-present) are time barred. The US Supreme Court has ruled that an original EEOC charge from the EEOC intake questionnaire is actionable.

• The Equal Employment Opportunity Commission issued a right to sue letter received on 12-29-2018 (90-day deadline March 29, 2019). Exhibit 1 #right to sue Approx. 11 months after I submitted my claim (10-26-2017) The EEOC issued a separate opinion as to my charges being timely. Exhibit 2 #EEOC timely claim

• As part of the EEOC investigation, City of Virginia Beach Senior Attorney Marjorie Smith, perhaps due to misinformation from or poor communication with her staff and other depts., misrepresentated both the duration and extent of the sexual harassment that I endured, misrepresented how I reported retalitation, stated in error that I had withdrawn that report, misrepresented my job status with the Virginia Beach Police Dept., misrepresented my injury status in January 2017 just before the Police Academy began, misrepresented the results of a grievance, presented many fabricated quotations which are crucial to Ms Smith's arguments (possibly fabricated by someone other than Ms Smith), submitted a document in an exhibit that has visibly been altered (a document terminating my employment with the VB Police Dept.) and concealed or perhaps was not aware of one important version of a document that exists in two versions in the City of VB's Human Resources file pertaining to illegal retaliation against me. In the Position Statement, Ms Smith additionally stated that the City of VB had not found that any Retaliation occurred; when in fact two documents from the Human Resources dept. (one of which Ms Smith included in her exhibits) both stated that retaliation appears to have occurred and both documents provided examples of retaliation specifics.

## FOIA and Ms Hawks

• With regard to Ms Greene, Stacy Hawks of City of Virginia Beach Central Human Resources oversaw three initial complaints by Ms Greene of sexual harassment, retaliation, and assault, Ms Hawks co-authored (as 2nd author) the City's Final EEO Investigation Report regarding Ms Greene, and Ms Hawks oversaw two years of assault and battery allegations that were ignored and suppressed. Although Ms Hawks played a key role in nearly every investigation regarding Ms Greene, upon FOIA request Ms Hawks stated that she had no notes of any kind, no interview notes, no reports, no Workplace Violence forms, no emails, no memos, and no paperwork of any kind relating to Ms Greene.

• **Statement of Claim**

## Description of Events

Shannon Greene, who is bilingual, was hired as a Visitor Information Assistant at the City of Virginia Beach Convention and Visitors Bureau (CVB) Dept., Visitor Information Center (VIC) Division (CVB/VIC), and began work on Nov. 22, 2015 at the age of 48. She had already applied to become a Police Officer, also at the City of VB, and that application was still pending when Ms Greene began working for the CVB.

Less than 4 weeks after being hired, Ms. Greene reported sexual harassment by a CVB/VIC volunteer named Edwin Salamonsky to Human Resources, and was ignored by Human Resources until Ms. Greene herself confronted the harasser with an email telling him to stop completely, and then after the email told her supervisors Scott Warren and Maria Aragon. In the days that followed, Mr Warren, the CVB Human Resources contact John "Cliff" Myers, Ms Aragon and the Central Human Resources employee Stacy Hawks told Ms. Greene that "people who can't take sexual harassment don't belong in the hospitality industry" (Mr. Warren, with Mr. Myers); the CVB needs "team players" and "complaining about sexual harassment" is not "team" behavior and Ms Greene should "quit"(Mr. Warren); "people who complain don't have the right kind of personality for hospitality" (Mr Myers and Ms Hawks); Ms. Greene "would be asked to do impossible tasks and should quit now" (Mr. Warren); sexual harassment is "a compliment" (Ms Aragon and Ms Hawks); specific tips on how to quit (Mr Warren); and it's easier to "get someone to quit than to fire them" (Ms Aragon and Mr Warren). In the months that followed, as severe daily retaliation began with Human Resources knowledge, City of VB employees made more statements, some of which are conceded by the City and are in writing: Ms Greene "complains about sexual harassment" and should therefore "not be hired" by other departments in the City (Ms Hawks; recorded in writing by VBPD Officer Timothy Kaufman); Ms Greene "needs to find other employment because she complains" (Ms Hawks; recorded in writing in an interview by the Director of Employee relations Melissa Bowers); Ms Greene "needs to withdraw her complaint of retaliation" or else lose her job (Ms Hawks; in interview notes); in light of "your complaint we are thinking that you are not a fit for employment here" (Mr Myers and Ms Hawks); and "You will be asked to do impossible tasks and you should quit now" (Mr Warren).

The comment "people who can't take sexual harassment don't belong in the hospitality industry" (stated by Mr Warren at a 12-28-2015 meeting, to which HR employee Mr Myers nodded) was reinforced the same day with 4 emails telling Ms Greene that she is a probationary employee and her employment situation depends on fitting in and vague evaluations. None of the four emails even mention Mr Salamonsky. Ms Greene was commended as a fine employee who fit in well, and there is not a single negative comment about Ms Greene from any source prior to Ms Greene reporting sexual harassment. Mr Myers wrote an email approx. 5 working days later suggesting that some sexual comments occurred but are out of character for the harasser; however, Ms Greene "needs more attention and orientation" into "how things are done at the City of VB" if she thinks she can "complain" about "sexual harassment." Ms Greene was later described by Ms Myers as "polite," "hard-working" and "great with people": the only problem mentioned was her sexual harassment complaint. Mr Myers then met with Ms Hawks and Ms Greene, said he had

investigated <u>only 2</u> of the many sexual comments made by Mr Salamonsky, did not interview any witnesses, said that Mr Salamonsky confirmed making sexual comments to Ms Greene, but Mr Myers stated that that this was a joke about a boxer who was featured in Playboy, and Mr Myers wrote in an email that these were "innocent comments" regarding Playboy magazine and female boxers, and Mr Salamonsky was trying to "help Ms Greene fit in." The harassment by Mr Salamonsky was persistent, unwelcome, and included more than two comments about Playboy and taking clothes off. Mr Myers had not investigated any of the other harassing comments by Mr Salamonsky that Ms Greene had previously reported to Brian Jackson of Central HR prior to the Playboy comments. There is no record of Mr Myers or Ms Hawks even speaking to Mr Jackson, and no record that Mr Jackson took any action. The sexual harassment by Mr Salamonsky included sexual joking about nudist colonies and joking about arousement among other jokes, and Ms Greene had given many clear signals, including not talking with Mr Salamonsky about any non-work topic, and moving her chair away from Mr Salamonsky, that the joking was unwelcome. The City claims, in error, that six weeks is not enough sexual misconduct to rise to the level of harassment. Even if the City were correct, the EEOC states: "in the EEOC's view, it can be reasonable to complain about behavior that is not yet legally harassment (i.e. even if the mistreatment has not yet become severe or pervasive)." It is worth noting that <u>Ms Greene was more focused on ending his sexual harassment than letting it continue to rise to a legal standard threshold</u> (and there is no indication that it was not already at that threshold). The EEOC specifically acknowledges this as a "reasonable" "complaint."

The Playboy comments occurred when Mr Warren stopped at a local gym to linger and watch Ms Greene boxing, also not appropriate, returned to work the same day, and told Mr Salamonsky in front of Ms Greene and a witness that "Shannon was really whaling on the heavy bag." After Mr Warren left the room Mr Salamonsky, who had already harassed Ms Greene for weeks and whom Ms Greene had already reported to Human Resources for sexual harassment, said to Ms Greene that she should "make money by working for Playboy," and after a pause when Ms Greene did not respond, added, "of course that would involve taking all your clothes off." Ms Greene did not interpret the remarks as "friendly" or "joking," but rather an assertion by Mr Salamonsky that Ms Greene's attempts to end his unwelcome sexual joking was not going to succeed; and his sexual joking was going to continue. The pause between comments appeared to be Mr Salamonsky waiting for Ms Greene to react. VIC co-worker Kathie Ward later stated that Mr Salamonsky had previously distributed a printed list of "borderline sexual" jokes to VIC female staff, including herself and Colleen Cullen and, according to Ms Ward, "watched our faces to see how we'd react" as they read the jokes. Ms Aragon of the CVB/VIC and Ms Hawks of HR both referred to Mr Salamonsky's Playboy comments as "compliments"; whereas Ms Greene, capable of distinguishing between a tactless compliment and persistent harassment, stated that the remarks were clearly unwelcome, were persistent, and seemed intended to denigrade her, as well as being intended to provoke some kind of reponse.

After Ms Greene reported Mr Salamonsky to Mr Warren in Dec. of 2015, the CVB and Human Resources Depts. began retaliating against Ms. Greene immediately, including attempts to terminate her employment, declaring that they would make her quit, shouting at her, making violent comments, making special rules for her, giving her approx. 550% the workload of her co-workers (which Ms Greene reported to HR, with spreadsheets); creating "Catch-22" work assignments, and then shouting at or reprimanding Ms Greene regardless of which option she chose; preventing her from transferring or receiving promotions; as well as a hostile work environment that slowly escalated into assault and battery. Retaliation continues to the present day and takes two forms: Small Retaliation is a daily obsession with mistreating Ms Greene, and none of her co-workers, by blaming her for other people's mistakes, keeping a close, harassing surveillance focused on her, denigrating her verbally, denying her privileges that her co-workers enjoy, fabricating mistakes by Ms Greene, denigrating Ms Greene in front of her colleagues, isolating Ms Greene, excluding Ms Greene from workplace social events, not approving the leave arrangements that her co-workers enjoyed, publicly displaying her work product in humiliating ways, publicly telling her and only her to change her seat multiple times throughout the day; praising anyone who gets angry at Ms Greene while punishing anyone who becomes her friend, etc.; and Big Retaliation in the form of assault, failure to hire, failure to promote, job trmination with the VBPD, targeted endangerment, sexual humiliation, etc. The EEOC precisely spells out illegal practices, many of which the City of VB did to Ms Greene to a far worse degree than the legal standard; and the EEOC also recognizes small retaliation: "an employer may not discriminate, for example, when granting breaks, approving leave, assigning work stations, or setting any other term or condition of employment --- however small."

As Ms Greene learned years later, in Jan. and Feb. of 2016 the EEOC was publishing new guidelines on retaliation, and HR publications such as "HR Morning" suggested policy changes and trainings to address retaliation vigorously; the City did not even keep up with basic HR trends. Ms Greene reported retaliation in Jan. of 2016 and in April of 2016 to Stacy Hawks. Ms Hawks, the Central Human Resources employee who knew about the sexual harassment, in violation of City policy 6.06 failed to investigate the retaliation, failed to report the retaliation claim to her two supervisors, Director of Employee Relations Melissa Bowers and Director of Human Resources Regina Hilliard, and subsequently made threats to Ms. Greene and told Ms. Greene to find employment somewhere else. Ms Hawks also threatened Ms Greene immediately with job loss if Ms Greene did not "withdraw" her complaint of retaliation and her report of violent comments, promising that they would be treated separately if Ms Greene withdrew her complaints. Ms. Hawks later admitted to threatening Ms Greene's job and demanding that Ms Greene withdraw her EEO complaints and reports of violent threats by her supervisor. Ms Hawks made these admissions under oath when Melissa Bower interviewed Ms. Hawks as part of an EEO investigation: Ms Hawks' threats are part of Ms Bowers' interview notes. There was no City-Policy-compliant investigation of sexual harassment and retaliation until 9 months after the events (Title VII requires prompt investigations), at which time the investigation resulted in the

City of VB document titled "Final EEO Investigation Report Complainant Shannon Greene." The Final EEO report concluded that there had been underlined widespread retaliation against Ms. Greene for reporting sexual harassment; however, the report was hidden from Ms. Greene (which is a violation of the City's policy 6.06), no remedy of the retaliation followed (in violation of Title VII), and the retaliation continued. At some point, a second version of the document was produced by the City of VB, in which the final paragraph was substantially altered to remove "retaliation" before sending the document to the EEOC. Both versions of the document are part of Ms. Greene's HR file (and despite the removal of one word: both documents document retaliation, whether they use that exact word to describe their findings or not). Ms Hilliard the Director of HR issued a separate opinion, in the form of a letter, that Ms Greene was the victim of what appeared to be retaliation. In spite of these two documents, Senior City Attorney Ms Smith wrote inaccurately in her Position Statement to the EEOC that "the City of Virginia Beach determined that there was no retaliation"; and Ms Smith concealed one of the two documents, or else it was concealed from Ms Smith; but other people in her office had it, so it was probably not concealed from Ms Smith.

Daily retaliation continued, Ms Hawks ignored a written report of a threat of violence by Mr Warren, and the retaliation escalated to assault. Endangerment by management appears to have resulted in an injury to Ms Greene. Assaults followed. The first assailant was Ms. Greene's supervisor Mr Warren; Ms Hawks and Mr Myers refused to examine video evidence of the assault which Mr Myers later admitted to, Ms Hawks refused to investigate the assault, and again did not inform her superiors or make any written record. In the months that followed, other assaults occurred and CVB administrators, usually Mr Myers, refused to investigate the assaults or even fill out the required Workplace Violence forms. The CVB Director's office wrote in late 2018 that not even one Workplace Violence form had been filled out, even though Ms Greene had reported more than 5 assaults by that point. The assaults were violent. The refusal to investigate assaults is itself an actionable retaliation: The EEOC's website guidelines, in effect from 2016 to present, state that "The Supreme Court has also said that actionable retaliation includes: the FBI's refusing to investigate death threats against an agent." Presumably the EEOC is referring to Rochon v Gonzales. By not conducting investigations or filling out Workplace Violence forms, the City of VB allowed the assaults against Ms Greene to continue and concealed them after they occurred. Unlike Rochon v Gonzales these were actual assaults and batteries of Ms Greene, not just threats. Ms. Bowers of Human Resources interrogated Ms. Hawks and Mr Myers to ask why they had not filled out a Workplace Violence form in one instance, and the two HR employees had no answer or explanation according to Ms. Bowers' interview notes; yet despite this interview by Ms Bowers, assaults continued and still no Workplace Violence forms were filled out, and assaults continue to the present day. Both the CVB and HR departments engaged in depraved and damaging acts such as kicking the injured Ms. Greene awhile injured, and creating excessive walking and physical assignments for Ms. Greene when she was injured; this violated a Limited Duty order by the City of VB contracted doctor and the Occupational Health Office (OHSS). Mr Warren, after kicking Ms

Greene while injured, for no reason immediately emailed a minute-by-minute description of his whereabouts to HR; he was probably anticipating being charged with assault. Just before kicking Ms Greene, someone (apparently Ms Hawks of Human Resources) sent Mr Warren an email telling him to physically visit Ms Greene and find out if Ms Greene's injury was real. In Mr Warren's minute-by-minute description, in the 10 minute time frame when he was kicking the injured Ms Greene he states that Ms Greene asked him "to sit with her" to "comfort" her. Ms Greene, a 5 foot 11 Police Officer recruit, does not request comfort under any circumstances from Mr Warren, a violent man, and the explanation is a lie. In another email Mr Warren states that they "sat quietly" together for the 10 minutes that Mr Warren could not account for (when he was kicking Ms Greene). Mr Warren then altered that account, and there are two different versions of what he was doing for those 10 minutes. Mr Warren also wrote a clearly dishonest injury report, with a falsified date, a day on which Ms Greene did not work at the VIC, and hid the document (which Ms Greene should have signed according to City policy) from Ms Greene with HR support. Ms Hawks and Mr Myers refused to investigate documents that Ms Greene brought regarding the assault, refused to look at video evidence, and gave their opinion (they did not see the kicks) that Mr Warren had kicked in her direction in a "harmless" way (Mr Warren's explanation when interviewed); Ms Hawks and Mr Myers told Ms Greene to find employment "elsewhere." Mr Myers and Ms Hawks wrote completely different made-up and contradictory accounts of that meeting later: in Ms Bowers' notes Ms Hawks admitted she asked Ms Greene to quit (The EEOC considers this a constructive discharge, equivalent to firing) but Ms Hawks stated that what she really meant was transferring to a different City position; Mr Myers' account is even more dishonest and states that Ms Greene out of nowhere volunteered to quit as a solution to the assault prolem (which does not make sense). Ms Hawks also called Ms Greene at home (google voice made a written record of her call), and told Ms Greene that she "must" meet with Ms Hawks immediately while injured. In violation of OHSS's light duty order, Ms Hawks, using the word "must," made the badly injured Ms Greene walk to both Building 18 and the Towne Bank building, where Ms Hawks expressed her opinion that the injury was "fake" in Ms Hawks' opinion, and also that Ms Hawks "would attack Ms Greene too" because Ms Greene is so thorough and precise and it "drives" Ms Hawks "crazy." X rays show that there were substantial stress fractures in delicate bones of Ms Greene's foot in the toe area, and her pain when walking was excruciating. Ms Greene asked Mr Warren to approve sick leave, flex days, or vacation leave, and he denied all three. After 2 days, Ms Greene's supervisors returned her to full duty assignments, telling Ms Greene. dishonestly, that she had only been approved for 2 days of light duty. Only later when meeting Nurse Valerie of OHSS in Jan. of 2017 did Ms Greene learn from Nurse Valerie that she was supposed to have had 9 days of light duty, not 2 days. Ms Greene checked the original paperwork and confirmed 9 days.

Mr Warren then wrote a false and negative performance evaluation of Ms Greene. Ms Greene's co-workers wrote letters of recommendation at the time describing her as "hard-working, professional, good at her job, and friendly." In Mr Warren's performance evaluation of Ms Greene

he wrote in one place that Ms Greene had never been late for work and in another place wrote that there were severe problems with tardiness, severe enough to fire Ms Greene. Ms Aragon swore with a signed statement to HR that she had no part in the performance evaluation, and Mr Warren swore in a signed statement to HR that Ms Aragon and Mr Warren wrote the performance evaluation together, so someone was lying. Ms. Aragon and Mr Warren shouted almost daily at Ms Greene, and met with Ms Greene to criticize her work incessantly for hours without any actual cause. Mr Warren sat extremely close to her, both managers blamed Ms Greene for other people's mistakes, reprimanded Ms Greene publicly, gave her job search tips and tips on how to quit, accused Ms Greene of theft that anyone could have done, accused Ms Greene of mistakes she could not have made, held Ms Greene to different standards than other employees, and placed Ms Greene on a disciplinary action/PIP that can be a first step toward firing. Ms Greene launched a grievance regarding her performance evaluation and disciplinary action, stating that they were dishonest and they were retaliation for reporting sexual harassment. Ms Hawks of HR, who had already threatened Ms Greene's job (merely for reporting sexual harassment and retaliation) now met with Mr Myers and CVB Director Brad van Dommelen and told them, before the grievance had even begun, that <u>she would see to it that the negative performance evaluation would be upheld.</u> Even just this promise by Ms Hawks, prior to investigating the discriminatory conduct, violates Title VII. Mr Myers documented Ms Hawks' illegal promise in writing in an email to Mr van Dommelen. Ms. Hawks, of the Central HR dept., had now suppressed allegations for the fourth time. Ms Hawks later claimed that she, Ms Hawks, had persuaded Ms Greene to withdraw her retaliation claims in a conversation with no witnesses. However, the conversation was audiotaped and no such withdrawal took place; City policy 6.06 also does not allow withdrawals once an EEO claim has been made, so City Attorney Ms Smith's rumor of a mysterious undocumented withdrawal, the crux of Ms Smith's Position Statement, is meaningless. Director of HR Regina Hilliard, claiming that she was now learning about the sexual harassment and retaliation for the first time, wrote that she found "many valid points" in Ms Greene's claim of retaliation, she found upon looking at data that Mr Warren held Ms Greene to different standards than her co-workers, she found that Mr Warren "wrote Ms Greene up" for actions that her co-workers also did and were not written up for: actions that in Ms Hilliard's opinion did not appear to be problems in any case (her notes state "What's the problem?") and her letter asserts there was no misconduct by Ms Greene. In this letter addressed to the CVB Ms Hilliard ordered the CVB to "scrutinize" the VIC office for evidence of retaliation. The CVB freely acknowledges that they never did that work, a Title VII violation. They promised in writing to change Ms Greene's performance evaluation, but they did not make the change, and they promised to remove the PIP from Ms Greene's record, but they did not remove it; and the P.I.P. stands in Ms Greene's HR file to this day. Ms Greene again reported retaliation, and the CVB again ignored her, which is also in a timeline of notes written by Mr Myers, in which he freely admits to ignoring all Ms Greene's retaliation allegations.

Ms Greene was a successful applicant to the Virginia Beach Police Dept (VBPD), a dept. within the

City of Virginia Beach. At age 48, she passed the police applicant fitness exam (PAT), and passed VBPD examinations regarding personality, intelligence, honesty (polygraph), psychology, suitability as a police officer, a list of medical exams, interviews with police officers, etc. The VBPD made supportive comments and discussed her age, but always in positive terms at that point in time. In violation of Title VII, Ms. Hawks of HR and Mr. Myers of the CVB told a VB police officer examining Ms Greene's VBPD application, Investigator Timothy Kaufman, not to hire Ms. Greene because she complains about sexual harassment. Even though no investigation had yet taken plane, Mr Myers told Mr Kaufman that Human Resources determined that the sexual harassment was "unfounded" (this was inaccurate, and Ms Bowers Director of Employee Relations later called "Mr Myers a "liar" for his comments surrounding sexual harassment.) The EEOC specifically mentions false or discriminatory job references as an example of illegal discrimination. The VBPD, with HR approval, complied with Ms Hawks and told Ms. Greene in writing that she had been declined for employment solely on the basis of "embellishment" of a "sexual harassment complaint." Ms. Hawks later blamed Mr. Kaufman and stated that Mr. Kaufman was "confused." In an unprecedented move, an HR employee, perhaps Ms Hawks or Ms Bryant of VBPD HR, "gave testimony" to the VBPD (his is recorded in writing) that Ms Greene had complained about sexual harassment and should not be hired: this illegal act by an HR employee was concealed from Ms Greene. Mr. Kaufman then wrote a report about Ms. Greene: a standard Background Investigation report at the VBPD for police officer candidates, but Mr. Kaufman mentioned "sex" 11 times in the report and wrote that a man "wanted to have sex with" Ms. Greene. In addition, Mr. Kaufman strongly implied that Ms. Greene was sexually assaulted (he stated that she was assaulted by a sex offender; which implies that Ms Greene was sexually assaulted; but Mr Kaufman knew that she was not), and Mr Kaufman wrote a scenario or brief anecdote (evidently from Mr Kaufman's imagination) involving Ms Greene being "pinned to a wall" at a City of Virginia Beach office "by a man in a sexual advance while he injured Ms Greene." These three major sexual passages were initially concealed from Ms Greene but the report was distributed to other City of VB employees. Background Investigation Reports are privileged and resistant to defamation claims, but this Background Investigation Report was so lacking in the basic components of a VBPD Background Investigation report (opinions of neighbors, employers' evaluations, summary of referents' comments, church and volunteer work, etc) that it is really not a Background Investigation report at all, but a documents that libels Ms Greene, it dishonestly degrades her chastity, attributes criminality where none exists, and explicitly, contrary to law, recommends that she not be hired because she reported sexual harassment. Ms Greene has never been sexually assaulted, or "pinned to a wall" in a "sexual advance" and   the suggestion is also irrelevant to his report, as is the remark in passing by Mr Kaufman that he had "uncovered" information that a man "wanted to have sex with" Ms Greene. Ms Hawks, when interviewed, appeared to know that at least one sexual "scenario" from the document was false; suggesting that she may have had some role in telling Mr Kaufman what to write; or some other reason for knowing that he made it up.  Miriam Bryant of VBPD HR praised Mr Kaufman's report. The sexual portions of the report were humiliating. Ms. Greene again filed a complaint, this time against Mr. Kaufman, for the sexual

harassment on the basis of his report, and Ms Greene's complaint was ignored and Mr. Kaufman was never investigated, and still has never been investigated to the present day, and this report still stands in Ms Greene's VBPD employment file. City Attorney Ms Smith never addressed Mr Kaufman's report in her entire Position Statement; and in fact ignored about 85% of Ms Greene's EEOC charge and presented many severe errors of fact in her Position Statement. Ms Greene presented documentation to HR that her sexual harassment had been misrepresented in Mr Kaufman's report. The VBPD reconsidered and allowed her application to proceed, but not for long. The report by Mr Kaufman appeared to seal her fate.

Ms Greene, still working at the CVB/VIC, continued reporting retaliation, assaults, and a safety issue involving a rat trap with teeth that was placed dangerously in a hidden area of a dark room exactly where Ms Greene was assigned by Ms Aragon and Mr Warren to work; Ms Greene was nearly injured; and the rat trap was removed by management after Ms Greene's assignment was ended. The rat trap was of a style that is illegal in Virginia and cannot be used for any purpose; yet the CVB admits it was placed at the VIC, and that Ms Greene was assigned to work in a room where the trap was placed dangerously facing Ms Greene hidden under the edge of a table. Still the CVB denied it was retaliation, or an OSH violation, or a Virginia code violation, or a problem of any kind. In fact, to cover up the fact that Ms Greene was specifically targeted, which she clearly was, the CVB returned the illegal rat trap to the dangerous position under the edge of the table so that it would endanger everyone equally and not just Ms Greene, which goes against the OSH Act and common sense. The CVB and HR depts. continued to ignore all Ms Greene's reports of retaliation. By now retaliation against Ms Greene had become a habit, and a Culture of Retaliation began in the CVB and HR depts. This Culture of Retaliation entailed both Large Retaliation such as falsified performance reviews, job denials for openly false reasons, and Assault and Battery (kicks, punches, physical threats, assaulting intimidation), planned dangerous situations, such as the situation that injured Ms Greene's foot and the rat trap, and conspiring to end Ms Greene's employment; as well as Small Retaliation in the form of persistent daily denigrations and humiliations. The HR dept. secretly looked into some of the EEO problems and Ms Bowers and Ms Hawks then wrote the report stating that there was widespread misconduct by management, an atmosphere of social bullying, and vengeful acts of retaliation against Ms Greene at the CVB/VIC office. The "Final EEO Investigation Report Complainant Shannon Greene," was hidden from Ms Greene, was not acted upon, and was either hidden from the CVB or the CVB denied having seen it. However, the interviews took place at the CVB so they were aware of it. No retaliation was corrected. The City attorney claims that "if" there was retaliation, it was corrected at a half-day training event involving running around in a room, but emails around the training state that it was not intended to correct retaliation or anything else: there was "no set agenda," no mention of retaliation, Mr Warren himself chose the activities; and Ms Greene's foot was injured and she could not participate in most activities.

The City of VB has generous policies regarding transfers: internal candidates are supposed to have

an advantage in job applications. This means that Ms Greene should have been a strong candidate for job transfers. However, Ms Greene was denied 13 out of 13 or 100% of transfers after reporting sexual harassment. The pretextual reasons given for the denials were openly false: Ms Greene "has no experience in MS Office" (she detailed extensive experience); Ms. Greene has "no experience meeting deadlines" (she worked as a Project Manager, which is defined by meeting deadlines, and demonstrated that she could meet deadlines), Ms Greene has "no experience with databases" (she clearly documented that she did), etc.  The usual standards of proof of pretextual and false job denials (as established by the US Supreme Court in St Mary's Honor Ctr v Hicks) are conceived for a single job denial in a theoretical vacuum. In Ms Greene's case there is additional evidence of widespread discrimination and hostility by Human Resources.

Mr van Dommelen and Mr Kuhlman said that Mr Warren "just" has  some "immaturity" issues. Mr Warren, seeing that he could get away with anything, brushed against Ms Greene's front body inappropriately and somewhat threateningly (she reported this), "shadowed" Ms Greene by matching her movements from behind within inches of Ms Greene, sat extremely close to Ms Greene, held multiple private meetings with Ms Greene and no one else, reprimanded her in public but held private meetings in which he sat excessively close to her to "discuss work," expressed a new interest in boxing, pestered Ms Greene about where she went in her lunch hour, asked Ms Greene if she went out at night, and made Ms Greene play a "teaching" role play with him about men getting undressed. Ms Greene reported him now for sexual harassment as well as retaliation and was initially ignored. Ms Aragon made a comment to Mr Myers that "Scott [Warren] is obsessed with Shannon" and instead of interviewing Ms Aragon, the CVB interrogated Ms Greene, urging her to state that Ms Aragon's comment was false. Instead, Ms Greene confirmed the statement and again reported Mr Warren for gender-based harassment, asking why it had not been investigated. <u>The CVB then assigned Mr Warren to "investigate himself" as 2nd investigator together with Mr Myers for sexual harassment. Mr Warren, by Mr Myers' written admission, did the "information gathering" to decide for himself if his "obsession with Ms Greene" according to Ms Aragon was gender-based harassment. In other words, Mr Warren investigated himself for sexual harassment,</u> and found himself innocent. Ms Greene requested to take a paid police-related training course and Mr Warren, who had no aspirations to a police career,  wanted to take the course with her at the same time, with no other members from the VIC. The training involved possibly turning the lights out and physically attacking an armed suspect (Ms Greene by then had been hired by the VBPD but had not begun yet, is a martial artists, and had every reson to take the training). Ms Greene asked to take the paid training course that possibly involved tackling a suspect at a different time to avoid Mr Warren, because he was sexually harassing her. Mr Myers of HR stated that if Ms Greene took the training with Mr Warren, then she would be paid for the training, but if she wanted to avoid Mr Warren, then she would not be paid. There was no reason to make the training unpaid. All other CVB employees were paid for all trainings, regardless of timing. Far from protecting Ms Greene from gender-based harassment as most HR employees would, Mr Myers was forcing her into it; just as he, Ms

Hawks, Ms Aragon, and Mr Warren again and again promoted assault incidents and then made sure there was no evidence or paperwork: which resulted in concealing the assaults after-the-fact.

Small retaliation continued and Ms Greene, solely for being a woman who opposed having her rights stripped, was relegated to a pariah or second class citizen with basic dignities removed: she could not have a chair like her co-workers, she was offered ripped City clothing that was unwearable, she was rebuked for minutiae while co-workers made enormous errors, her birthday cards, if she even got them, were 10 days late while the office went to enormous efforts to send birthday cards on time to everyone else, different policies were created for Ms Greene, she was denied flexibilities in using leave time that her co-workers enjoyed, etc. Ms Greene had to work while her co-workers enjoyed a Christmas party preparation; and then her co-workers were paid for attending the party, but Ms Greene was not. With a threat of violent assaults, Ms Greene decided to take some of the rights she was denied, not because she wanted parking spots, bathroom storage, birthday singing privileges, etc., but because it made her safer from assault when she asserted her rights and expressed an unwillingness to be bullied. The City's liability in denying her these rights is not negated just because Ms Greene took some of them herself: when they denied her bathroom/parking/furniture/birthday office customs, they also denied her dignity. In Connecticut v Teal the US Supreme Court makes clear that Title Vii is focused on "the protection of the individual employee" to enjoy a harassment- free environment: the fact that some women were not harassed, and some women, astoundingly, even performed the discriminatory acts toward Ms Greene, is not an employer defense. Title VII does not seek a "bottom line" of large numbers of unharassed employees from a class, but rather protects the individual from "working conditions that have been discriminatorily altered" (Harris v Forklift Systems, Us Supreme Court).

Ms Greene had received a job offer from the VBPD in January 2017 and had signed employment papers and a contract to work for the VBPD beginning in March 2017 by entering the Police Academy. Ms Greene had been fitted for a police uniform, a belt for her sidearm, and boots; and Ms Greene had made friends with many recruits. During the psychology exam in Dec. 2016, the City psychologist had asked Ms Greene multiple times if she had been raped; the answer is no; in addition, it is hard to believe that all Police Officer applicant men are asked this question. Police Officers are paid while attending the Police Academy, and they receive full City of VB health benefits and are on salary (approximately $38,000); they are called Police Officer Recruits until they complete the 6-month Police Academy, at which time they receive an immediate raise in salary (approx. $45,000) and are promoted to Police Officer. However, the VBPD declined to place Ms Greene on the phone tree list for new hires, declined to tell Ms Greene the starting date of the Police Academy, and declined to send her a final offer of employment in the mail: they sent it by email to Ms Greene; but other candidates received a posted letter. Ms Greene asked what the procedure is for a postponement if postponements are possible, and she brought a doctor's note.

She met with Michele Borden (Ms Borden denies that they met, and produced sign-in sheets but there must be some mistake, because they did meet), and Ms Borden stated, with regard to the new hire Ms Greene, that Ms Greene would "never be able to keep up with the young people" and other age-discriminatory remarks. On the same day that she made those remarks, Ms Borden secretly fired Ms Greene; but the VBPD HR later said it was a postponement and that Ms Greene's status continued to be "new hire." After the firing, no one answered Ms Greene's calls or emails or even told her she had been postponed or fired. Ms Greene thought she was about to attend the Police Academy and she purchased requisite items.

Ms Greene was running about 15 miles/week, sometimes as much as 40 miles/week (which is stated in her doctor's notes) this is more than adequate running preparation for starting the Police Academy, where up to 10 miles/week is normal. Ms Greene was medically cleared for the Police Academy in December 2016. Ms Greene's doctor wanted a postponement and a few more weeks for her foot to heal her foot injury: he wrote a note and specified a very short time of approx. 3 weeks in which he wanted her to fully rest her foot; Ms Greene could have done this and still attended the March 2017 Police Academy. Ms Greene's doctor wanted a postponement if possible to be 100% sure about the foot healing. Ms Greene was declined admittance in the March Police Academy by Ms Borden on the basis of her doctor's note. When Ms Greene asked in March and April of 2017 what happens next, she was completely ignored until July of 2017, when Captaing Todd Jones of the VBPD Law Enforcement Training Academy stated that Ms Bryant of HR (the same Ms Bryant who previously intervened, with Ms Hawks, to deny Ms Greene employment because she had reported sexual harassment) would determine what Ms Greene had to do to prior to the next Academy, the Sept. 2017 Academy. Ms Bryant clarified that Ms Greene was not an applicant, she was a new hire, but there were some benchmarks she needed to clear in order to attend the Sept. Police Academy. Seven attempts by the City of VB to terminate Ms Greene's "new hire" employment status with the VBPD followed. In addition, Ms Greene had to re-take many exams, which appeared to be unnecessary. Ms Greene had to re-take the physical exam (PAT) and she ran even faster than before her injury, and about twice as fast as the PAT requirements, outperforming all but one person in her testing group. Clearly, she had foot issues but they were not impeding her fitness and ability to perform. The HR and VBPD depts. kept adding new requirements for Ms Greene that she had already passed: polygraph, psychology, medical document review, background, etc.. Michele Borden of HR/OHSS, who had made age-discriminatory remarks such as "you'll never keep up with the young people" was particularly hostile to Ms Greene, filled out paperwork stating that Ms Greene had failed her medical exam; yet Ms Borden submitted the paperwork (about failing the medical exam) before the medical exam took place. The date next to her signature also confirms that the medical exam had not yet occurred.

There is a "medical exam" (really a medical document review) prior to VBPD job offers in which a contracted non-practicing physician assistant (PA) reviews the results of exams such as heart

health, blood pressure blood analysis, urine tests, etc, and reviews doctor's notes. It is not an assessment of fitness (only the PAT exam is), and the Physician Assistant who meets with the VBPD applicant does not even know the VBPD fitness requirements. The PAT is the only test of fitness, and it is a rigorous test. Ms Greene had already passed the PA's medical exam in December of 2016, and had now passed the PAT twice, most recently in August of 2017, when Ms Greene was regularly running 15 miles per week or more, and her foot felt very comfortable, but with some discomfort after her longer 7 or 8 mile runs: however, this is more running than the Police Academy requires. A 3-mile run is typical for the Academy. Ms Greene indicated that she still felt "discomfort" after 5 miles, but not enough to stop her from running another 3 miles, and then running again the next day. This is more than adequate for completing the Police Academy. Ms Borden (who made the age-discriminatory comments and failed Ms Greene dishonestly for her medical exam before the date of the exam) ordered Ms Greene to re-take the medical exam, which is actually a medical review of paperwork, for reasons that are not clear. Very specific rules govern the medical exam for the VBPD, and those rules are spellled out in the VBPD Hiring Guidelines, a policy manual for the people who administer VBPD exams. In violation of those rules, the Physician Assistant (PA) Tammy Avila who is not allowed to express a medical opinion but can only 1. interpret documents or 2. conduct a physical exam in accordance with so-called HPS guidelines (this is spelled out in the VBPD Hiring Guidelines), decided not to conduct a physical exam, and stated that without any evidence or x-rays, and without any exam, and completely ignoring two doctors' notes that clarified that Ms Greene was fit for Full Police Duty, she, the PA, did not want Ms Greene to enter the VBPD. The PA does not have the authority to disagree with physicians, as the Director of OHSS later stated. The PA does not have the authority to assess fitness. The PA does not have the authority to speculate about Police Academy success. The PA does not have information about fitness requirements or exercise requirements at the Police Academy. The PA met with Ms Greene, was immediately inclined to fail Ms Greene for no reason and promised her that it would be a "postponement until the March 2018 Academy"; not an actual termination of employment (this was misinformation). The PA said that "older" people's bones heal "more slowly," and that "even people younger than you" have trouble with the Police Academy exercises. She cited "burpees," which are not in the HPS guidelines, and therefore, according to VBPD Hiring Guidelines, cannot be used as an exam benchmark at the medical exam. The PA had no idea how many burpees are required at the Academy. The VBPD had told Ms Greene "up to 300/day" at first (1,500 per week is a very large number), then just before the medical exam (and Ms Greene did not receive the email until after the medical exam) changed their estimate to 100 per day, a more realistic estimate. VB Police Academy graduates say that even the 100/day estimate is greatly exaggerated: recruits actually do far fewer burpees. The PA, who put in writing in two different documents that she never conducted an exam, told Ms Greene to go home and wear her boot cast and she would soon make her decision. The PA recommended postponement due to the foot injury (now 18 months healed), even though in Jan 2017 the same PA had okayed the same injury when it was only 10 months healed. The Director of HR/OHSS got involved and stated that he agreed with the negative age comment about Ms Greene, but that

the actual reason Ms Greene was declined was because she did not have a full duty note from her doctor, which was also not true (Drs. Prom and Winters both wrote Full Duty notes) ; but no correction was made. The PA had made the decision to "postpone" Ms Greene's Police Academy entrance until March of 2018 but Captain Todd Jones of the VBPD said it would not be a postponement, but rather a job termination; and Ms Greene was free to re-apply all the way from the beginning like any other applicant. Ms Greene wrote at least 10 emails explaining to various officials that this was all a misunderstanding, there was no concrete or legal reason to fail the medical exam, and she had two full duty notes from her treating physicians. The VBPD and OHSS declined to correct their error and re-hire Ms Greene.  Ms Greene then reported all of the City of Virginia Beach's discriminatory retaliation, assaults, gender-based harassment, multiple job denials,  and now, VBPD job termination, to the EEOC.

Ms. Greene applied for a promotion at the CVB/VIC to the position of Supervisor/Admin Tech in July of 2018 for which Ms Greene was highly qualified and more experienced in supervising than other candidates. The job was only advertised for two days. The Hiring Manager was Ms Aragon, and despite strong qualifications Ms Greene's application was immediately denied by Human Resources, like all of her other transfer requests/job applications, for reasons that were openly false, and easy to prove as being false. The reason provided by HR was "no experience creating work schedules"; Ms Greene writes work schedules for the City of VB, and HR was not only aware of that fact and had emails about it, but they also commented about it in the Final EEO Report. The position continued to remain open after Ms Greene was eliminated.

The City Attorney's office itself began retaliating against Ms Greene by shunting  document requests from other depts. to the FOIA Office. For example, Ms Greene asked for copies of Workplace Violence forms and injury paperwork pertaining to herself that should have been sent to her but were not. These were requests from her City email to City offices: in other words: workplace requests not in her capacity as a citizen of Virginia Beach but rather during City work hours from a City email with the City logo. However, her emails got sent to FOIA and Ms Greene was threatened with charges. In another example, the FOIA office stated they would charge Ms Greene for documents, and also that they would charge her without receiving prior permission from Ms Greene.  Melanie Johnson of the FOIA  office went one step further and deceived Ms Greene about the cost of a FOIA request and told her it would be free of cost, then prepared a large invoice.

Seven assaults of Ms Greene had occurred by now. After a particularly violent assault and battery against Ms. Greene by a co-worker, Kathie Ward in Aug. of 2018, Ms Greene emailed the City Manager Dave Hansen and asked him to take the assaults and battery seriously; a biased and hostile investigation ensued in which the investigators, including Ms Aragon and Mr. Myers, made derogatory comments about Ms. Greene, praised the assailant (a temporary employee with a criminal record, who claimed she was just playing around and it went too far), and distributed

information that alleged that Ms. Greene is a homosexual. Mr. Myers also investigated and scrutinized Ms. Greene's so-called homosexuality by commissioning a special report of how Ms Greene touched a woman in and outside of work in both sexual and non-sexual ways, explained that he needed the report in order to understand the physical contact so that he could "understand the non-working relationship" between the two women; and he distributed this report to City employees. Ms Ward, after battering Ms Greene, made an obscene gesture to her witnessed by another co-worker (this appears in Mr Myers' notes), attempted to batter her again, and accused Ms Greene of homosexuality. The Supreme Court allows some forms of homosexual teasing among men, and does not consider this sexual harassment. However, Ms Ward battered Ms Greene, made a sexual gesture, and assaulted her again. I believe this is different than men teasing each other about being gay. Mr Myers' report "investigating" Ms Greene's "relationship" outside of work by examining its so-called physical woman-on-woman touch component, on top of assault, battery, an obscene sexual gesture, and a written report of homosexuality, was incredibly sexually humiliating. Mr Myers spelled out that he wanted to know about their relationship, not about assault, when he asked for a list of how Ms Greene touches women. Mr Myers also distributed full-length photos of Ms. Greene in workout wear sent to upper management by email; but no similar photographs of the assailant or anyone else were distributed.   Part of Ms Ward's signed statement was a signed confession that she had choked Ms Greene in a previous battery, a battery that Ms Greene had also reported and had been a violent surprise choke from behind. Ms Ward claimed that she had an affirmative defense: Ms Greene wanted Ms Ward to demonstrate a "police choke hold." Ms Greene pointed out the impossibility of this explanation: there is no such thing as a police choke hold, and Ms Greene (with karate and jiu jitsu experience) had written a book on self defense for police officers, co-authored with a jiu jitsu black belt; so why would Ms Greene ask Mr Ward a question that she 1. knew the answer to and 2. could have asked a better authority than Ms Ward? In addition, being choked is not a good way to learn a choke hold because you can't see anything. Mr. Myers, Ms. Aragon, and Director of Tourism Mr Kuhlman ignored Ms Greene's explanations and found the workplace violence investigation results to be "inconclusive" despite having a signed confession by Ms Ward that she choked Ms Greene. They then forced Ms Greene to sit next to two of her assailants in a dark room and watch a video about a self-proclaimed homosexual woman explaining how to "learn to trust"; an apparent reference to Ms. Greene. Before the training began, HR Trainer Patricia Greer told Ms Greene that she can live with assault and battery if she tells herself "I CAN live with assault and battery." The training  was not intended to address retaliation or assault and battery, and neither word was ever mentioned. There was a personality assessment, (DISC), followed by VIC policy guidelines and an invitation to express anger and frustrations. In the DISC test Ms Greene was the only employee in her CVB/VIC office including Ms Aragon for whom "honesty" was listed as a personality trait. "Peace maker" was also listed for Ms Greene. Ms. Greene had also filed a complaint against another assault incident by Margaret "Peggy" Breslin, an assault that occurred a few months after the Ms Ward assault, and Ms Greene's complaint was corroborated by two affidavits by Park Rangers; but still nothing was done to increase Ms. Greene's safety. Emails

surrounding the investigation of battery attest to tremendous bias against Ms Greene before the witnesses were even interviewed; the same would be true in emails for the Breslin assault. In one email to Ms Greene's administrators, Ms Aragon referred to Ms Greene as having emotional "episodes" when she accuses people of assault and battery. This is libel, and it is also retaliation, and it is also sex discrimination. Ms Greene was a Police Officer Recruit. A male Police Officer Recruit reporting assault and battery would generally be believed; the CVB instead speculated on Ms Greene's emotional state, a form of sex stereotyping.

Ms Breslin launched a grievance after she received a written reprimand: competetive bodybuilder Ms Breslin had put her finger up to Ms Greene's face "about 6 times" while shouting invectives at Ms Greene at First Landing State Park, and warned Ms Greene not to report the fact that that Ms Breslin appeared to be cheating taxpayers by misrepresenting her work hours. Ms Greene reported Ms Breslin for violence and two Park Ranger witnesses confirmed Ms Greene's account. Following the assault, Mr Kuhlman, who never got involved in VIC email chains before, sent two praising emails to Ms Breslin (and none to Ms Greene), and CC'ed the whole VIC office. Yet again, administrators publicly praised everyone who assaulted or battered Ms Greene, thus giving a subtle message (that was really not subtle) that the CVB dept. will support and reward anyone who assaults or batters Ms Greene. In Ms Beslin's grievance, a Panel Board was convened comprised of three persons, Ms. Ruby Christian, Mr. Larry Shackelford, and Ms Sharon Brown, appointed by Virginia Beach City Council. The City Attorney, HR dept, and CVB dept. gathered other VIC employees, mostly part-time employees, who had been reported by Ms Greene for assault or fraud, and presented them as witnesses against Ms Greene, but labeled them "material witnesses." Not one of the 6 "material witnesses" had witnessed the assault. The City also asked Michele Borden to appear: the nurse who submitted a form to fail Ms Greene for a VBPD medical exam (with no reason given) before the date on which the exam occurred. Ms Borden was completely immaterial to an assault committed against Ms Greene by Ms Breslin: Ms Borden presented evidence in a blue folder that she had to go and get. As Ms Borden passed Ms Greene in the hallway 3 times during the Panel Board hearings, each time she passed Ms Greene, Ms Borden turned her head slightly toward Ms Greene and coughed 1-3 times without covering her mouth, in what appeared to be a gesture of animosity. Mr Kuhlman of the CVB, and a man who called himself Mr Jeff or Joe Mitchelsky, who acted as defense attorney for Ms Breslin, were supposedly on opposing sides, but they arrived together in the same vehicle. The City was supposed to assemble a case against Ms Breslin, but instead used the Breslin grievance as a pretext to assemble a case against Ms Greene. As stated above, when Panel Board member Ms Ruby Christian asked Mr Myers, regarding the multiple assaults of Ms Greene and the general conflict with Ms Greene, "When did all this begin?" Mr Myers answered that the assaults and so forth began when "Ms Greene reported gender-based harassment about six weeks after beginning her employment with us." In other words, Mr Myers conceded that assaults and animosity toward Ms Greene began when she reported sexual harassment.

## COUNTS
### (Multiple Counts of Each)

Retaliation
Sexual Harassment
Unequal terms and conditions of employment
Illegal job termination
Discriminatory Failure to Hire
Discriminatory Failure to Promote
Sex discrimination
Disregard for a Limited Duty Order
Libel and slander
Hostile Work Environment
Malice and Reckless Indifference
Assault and Battery
Depraved Indifference to Assault and Battery
Accessory to Assault and Battery
Reckless Disregard for Plaintiff's Emotional Distress
Denial of basic rights to safety under 42 USC 1981 and violations of the OSH act
And other Counts (Not a Complete List)

### Evidence Linked to Exhibits

### Clear Declarations of an Intent to Retaliate

- Title VII does not require a declaration of intent to retaliate. Nonetheless, City employees not only retaliated but openly stated that they intended to.
- Sexual harassment by Mr Salamonsky ended when Ms Greene herself sent Mr Salamonsky an email. Exhibit 78 #eds comments-my email-his email
- According to emails surrounding Ms Greene's report of sexual harassment, retaliation by the CVB and HR dept. appears to be the result of several emails and meetings, as represented in the attached flow chart. Exhibit 3 #flow chart; see also Exhibit 92 #organizational chart

There is significant proof that the statement "people who can't take sexual harassment don't belong in the hospitality industry" occurred (as well as the subsequent comments):

- Four emails following the meeting are about vague ways that Ms. Greene can be evaluated, & Ms. Greene, not Ed Salamonsky, being under scrutiny. Exhibit 4 #four emails

- Mr. Myers also wrote to Stacy Hawks shortly after the meeting. He clearly states on Jan. 6, 2016 that he is not done with Ms. Greene, and that because Ms Greene reported

sexual harassment, Ms Greene "needs more attention" and "needs to be oriented." <u>Exhibit 5 #cliff-orient to our city</u>  Severe retaliation immediately followed this email. Ms. Greene, in an email to Stacy Hawks two days later, stated that severe retaliation had occurred. <u>Exhibit 9 #Retaliation began 1-8-2016</u>  Ms Greene was not aware of the Jan. 6 email when she made the Jan. 8 report of retaliation. Timing is recognized by the EEOC as a fairly compelling evidence of retaliation, together with other circumstantial factors.

• Mr Myers made a statement that is very similar to Mr Warren's comment from 12-28-2015. Mr Myers said "Hospitality requires a certain kind of personality. Someone who makes complaints isn't a fit." Then he and Ms Hawks discussed other jobs for Ms Greene

• Ms Hawks conceded in writing that she met with Mr Myers and Ms Greene and that recommending that Ms Greene find other employment was discussed. <u>Exhibit 6 #Melissa interviews Stacy</u>, p. 2. Mr Myers' account of the same meeting completely disagrees with Ms Hawks' account but he also mentions other employment for Ms Greene, with no reason given other than the fact that she complained about discrimination. <u>Exhibit 7 #cliff-timeline</u>

• When Director of Employee Relations Ms. Bowers interrogated Mr. Warren about the 12-28-2015 meeting and the "people who can't take sexual harassment don't belong in the hospitality industry" comment, Ms. Bowers made the handwritten comment in her notes that Scott Warren had discrepancies in his description of that meeting. <u>Exhibit 8#Scott had discrepancies about Dec. 28</u>

• Ms Greene reported to Human Resouces that Ms Aragon took the reins in a conversation between Ms Aragon and Mr Warren about how to get rid of Ms Greene. <u>Exhibit 10 #ten-page email, p.8</u>  Ms Aragon said "It is easier for us if we can get an employee to quit" versus going through the process of "firing" an employee.

<u>Non-Compliance with EEO Guidelines</u>

<u>The City of Va Beach Title VII compliance for the events pertaining to Ms. Greene has ranged from 0% at the lowest to 28% at best and those inflated numbers are only when viewed in the best light for the Defendant.</u> The wording of Title VII is "prompt investigations" and thorough action to "correct any and all" violations regarding both harassment and retaliation.

The response rate for sexual harassment (in events pertaining to Ms. Greene) was among the worst, with a <u>16.7% response rate simply in terms of the City of VB's willingness to even investigate sexual harassment.</u> The response rate for addressing retaliation is even lower, 3.7% responsiveness. The response rate for addressing assault and battery is 28.6%. Finally, the response rate for addressing retaliation in the form of failure to hire is 0%. The results are summed up in a chart below, and details are provided in Exhibits 6-9.

| Conduct at the City of Virginia Beach that Violates Title VII of the Civil Rights Act of 1964 | Did the City of VB meet its Legal Obligations under Title VII? | Percentage of Title VII compliance and Evidence |
|---|---|---|
| Sexual Harassment | No | 16.7% <br> <u>Exhibit 11 charts+statistics</u> <br> <u>Sexual harassment</u> |
| Retaliation in the Form of Failure to Hire | No | 0% <br> <u>Exhibit 12 charts+statistics</u> <br> <u>Failure to hire</u> |
| General Retaliation | No | 3.7% <br> <u>Exhibit 13 charts+statistics</u> <br> <u>General retaliation</u> |
| Retaliation in the Form of Assault and Battery | No | 28.6% <br> <u>Exhibit 14</u> <br> <u>charts+statistics</u> <br> <u>Assault and battery</u> |

Ms. Greene received 2 out of 2 or 100% of jobs she applied for before reporting sexual harassment, and 0 out of 13 or 0% of jobs she applied to after reporting sexual harassment. Specifically:

• From 9-9-2015 to 10-2-2015 Ms. Greene applied to two City of VB jobs and both applications resulted in job offers (Visitor Information Assistant and Police Officer Recruit).

• On 12-14-2015 Ms. Greene reported sexual harassment to Mr Jackson of HR

• After 12-14-2015 Ms. Greene should have been a higher-ranking candidate for City of VB jobs (due to having City of VB experience), but from then her new applications never resulted in a City job offer again. From 1-7-2016 to 7-26-2018 Ms. Greene was declined for 13 job applications, most of which she was qualified for, one of which she was likely the most qualified candidate, and the positions continued to be open after Ms Greene was declined. <u>Exhibit 15 # Jobs-Timeline of Jobs Applied to; Exhibit 16 #job apps-denial; Exhibit 17 job apps-evidence of qualifications</u>

## LACK OF PROMPT INVESTIGATIONS AS TITLE VII REQUIRES (UNDISPUTED FACT)

• The City concedes that the investigation of retaliation did not begin until 7 months after Ms Greene reported retaliation (9 mos. after sexual harassment was first reported to HR) in April of 2016. <u>Exhibit 18 # Stacy Hawks email; Exhibit 10 #ten-page email;</u>

• Ms. Greene's three December 2015 complaints regarding sexual harassment by Ed Salamonsky were formally investigated beginning 9 months later. <u>Exhibit 18 # Stacy Hawks</u>

email_ No reports or notes were written until 9 months later. The City also concedes that Mr Salamonsky telephoned a potential witness at home regarding what she would say if investigated.

• In April of 2016 Ms. Greene sent Central HR a 10-page letter describing retaliation in detail, including violent comments and threats from her supervisor, who stated that he would not revive Ms Greene if he found her body dead; and he told Ms Greene while laughing that he dropped a hot iron on his wife and when he watched the pattern of her skin bubbling. Exhibit 10 #ten-page email; The City waited 7 months to investigate retaliation and never investigated the violent comments.

• Ms. Greene reported additional retaliation in Oct. 2016, and this was also ignored. Mr. Myers, in an email to CVB Director Brad van Dommelen, admitted to receiving this report and not acting on it in any way. In fact, Mr Myers wrote to Employee Relations (i.e. Stacy Hawks) and asked Human Resources' permission to erase Ms Greene's comments regarding retaliation. Exhibit 7 #cliff-timeline, P. 2

• The retaliation and violent comments by Mr Warren escalated to what Ms Greene called "physical intimidation" (actually assault; kicking her while she was injured). After Ms. Greene reported both Mr Warren's violent threats and his assault, the City of VB did not take any steps to prevent more assaults. Six months later, the HR dept. also omitted mentioning the violent comments and the assault in their report, the Final EEO Investigation Report, Complainant Shannon Greene (both versions). Ms. Hawks, the co-author of that report, had personally received an email about the assault, meaning that Mr Warren's assault, which was reported by Ms Greene in writing,  was actively concealed by both the CVB and Central HR.  Exhibit 19 #workplace violence-never filed; Exhibit 20 #assault report-scott warren For the next two years, Ms Greene reported other assaults in writing (being punched, approached with fists, etc) and still no Workplace Violence forms were filled out for two years: meaning that Ms Hawks, Mr Myers, Ms Aragon, Ms Warren and Karen Kephart of CVB HR all worked to conceal assaults.  Exhibit 72 #selected assault reports; Exhibit 19 #workplace violence never filed; Exhibit 45 #assaults and when SG reported them

• When nvestigator Timothy Kaufman created a violent fictional scenario of a sexual nature involving Ms. Greene, and implied sexual assault, and said a neighbor "wanted to have sex with Ms Greene," and sent it to other police officers, Ms. Greene promptly reported the sexual focus of the report to Central Human Resources. Ms. Greene's sexual harassment allegation against Inv. Kaufman was never investigated. Ms. Greene again reported Mr. Kaufman's misconduct in the spring of 2017, and still Mr. Kaufman was not investigated. Exhibit 21 #reporting kaufman; Exhibit 22 #sex in the kaufman report; Exhibit 80 Kaufman report-Analysis

**CRIMINAL KATHIE WARD CHOKED MS GREENE AT WORK, AND WROTE A HANDWRITTEN SIGNED CONFESSION THAT SHE CHOKED MS GREENE. YET MR MYERS, MR KUHLMAN AND MS ARAGON WHO INVESTIGATED WROTE THAT THE RESULTS OF THE INVESTIGATION WERE "INCONCLUSIVE" AND MR MYERS WROTE AN EMAIL AND DECLINED TO TAKE STEPS TO MAKE MS GREENE SAFE (UNDISPUTED FACT)**

Ms Ward's choking of Ms Greene was part of an ingrained Culture of Retaliation against Ms Greene. Ms Greene's co-worker Kathie Ward has former criminal convictions (for solicitation and public lewdness). Ms Ward choked Ms Greene at work and held a tight choke hold preventing Ms Greene from breathing, from behind, while Ms Greene was sitting on a swiveling desk chair and Ms Ward was standing: the swivel chair was bent back from how violent the choking was. Ms Ward admitted to choking Ms Greene in two documents. Ms Ward's documents contradict each other, and Ms Ward states, in essence, that she absolutely did not choke Ms Greene but just in case she did choke Ms Greene, Ms Greene wanted to be choked: one document states "no choke" Exhibit 56 #touches-request by cmte 9-13-2018 (touch #6 on the list) and one document states "One day she asked me to show her what a choke hold is. I told her she had to sit down, etc." Exhibit 89 #kathie ward-main choke admission; Exhibit 91 #kathie assault docs-SG response

There are some technical terms and background information: Ms Greene practices Brazilian Jiu-Jitsu and the world jiu-jitsu champion is her friend. Ms Greene's friend taught jiu jitsu to police recruits at the VBPD. It is complete nonsense that Ms Greene would ask Ms Ward how to choke someone. Choking is illegal in police work. However, if Ms Greene ever wanted to know how to choke someone, first of all she already knows because she has 2 stripes in jiu jitsu and that rank is impossible to obtain without knowing and mastering a number of basic choke holds (chokes and choke holds are the same thing). Secondly, if Ms Greene did have any questions about chokes she would ask the world champion, not Ms Ward, who is not a martial artist. Like all martial artists, Ms Greene only practices martial arts with other martial artists in a safe gym with people who are trained in how to control themselves and not hurt anyone. Ms Greene has never shown or demo-ed or done any martial arts in any form at work, which Ms Ward and Mr Myers also lied about. Ms Greene's City of VB personality assessment says "peace maker." When Ms Ward placed Ms Greene in a choke from behind by surprise with extreme speed and violence, martial arts did not help Ms Greene, nor is there any way she could have escaped. Because her swivel chair was leaning back from the violence of Ms Ward's sudden choke, Ms Greene was in extreme danger of falling from the chair as well as from the choke. Ms Ward stated that just in case she had choked Ms Greene, it was a demonstration of how police officers hold suspects. Exhibit 56 #touches-request by cmte 9-13-2018 (touch #6 on the list) The choke that Ms Ward did was a rear naked choke and it one of the most lethal and common forms of choking. Ms Ward probably learned this from her career in "solicitation" and "public lewdness," since it is used in that career and not by police officers. Ms Ward probably learned extremely violent forms of self-defense and from approx. 2017-2018, with Mr Myers' permission, she used three of them offensively on Ms Greene: a choke, a kick to the back of Ms Greene's knee (also not a police technique), and pulling

Ms Greene's finger backward. These are street techniques for lethal self-defense. Ms Greene, who passed the VBPD polygraph given to all VBPD applicants with 99.4% honesty, consistently stated that the choke at work by Ms Ward was a violent surprise from behind, and was not welcome in any way. Mr Myers, Ms Aragon, and Mr Kuhlman made certain that Ms Ward would not be found guilty of violence, their investigation was "inconclusive" <u>even when they had a signed confession</u>, and the assaults continued. Ms Greene pointed out that even "inconclusive" means that Ms Ward <u>may</u> have battered Ms Greene, and asked the committee for "steps to ensure my safety," to which Mr Myers declined and stated "you are safe at work." <u>Exhibit 90 #cliff-you are safe</u>

**MS GREENE WAS FIRED FROM THE VBPD FOR SUPPOSEDLY FAILING TO PROVIDE A DOCTOR'S NOTE THAT SHE HAD PROVIDED 6 MONTHS EARLIER. IN ADDITION, HER JOB TERMINATED ON SEPT 16, 2017 FOR MISSING PAPERWORK TWO DAYS <u>PRIOR</u> TO THE DAY ON WHICH OHSS CLAIMED THEY DISCOVERED THAT HER PAPERWORK WAS MISSING ON SEPT 18, 2017. (TWO UNDISPUTED FACTS)**

The job termination occurred on 9-16-2017 supposedly due to failing a medical review ("medical exam," but there was no exam, just a review of medical papers). <u>Exhibit 41 #michele borden-9-16</u> However, that job termination was two days before the medical review/exam on 9-18-2017. Director of OHSS Scott Kalis states that Ms Greene failed her medical review of paperwork on 9-18-2017. Mr Kalis states that Ms Greene failed her medical review/exam because she did not submit a <u>full duty note from her treating physician</u>. <u>Exhibit 33 #scott kalis-not cleared by pcp</u>

"Treating physician" suggests Dr Prom, who treated Ms Greene for her foot injury; and just in case, Ms Greene had also submitted a full-duty doctor's note from her primary care physician, Dr Winters, to make absolutely sure that she would pass the medical "exam" (medical document review by a Physician Assistant). Both doctors cleared Ms Greene for full duty: Dr Prom on 5-25-2017 and Dr Winters on 9-5-2017. Both letters are prior to the job termination on 9-16-2017 and both letters are prior to the medical review on 9-18-2017. OHSS released Ms Greene from Limited Duty and placed Ms Greene on Full Duty on 5-25-2017 at the CVB/VIC because they received Dr Prom's full duty letter, so they cannot deny that they received it and acted on it. <u>Exhibit 35 #Dr Winters; Exhibit 36 #Dr Prom Full Duty Letter</u>

**IRREGULARITIES IN THE FINAL EEO INVESTIGATION REPORT, COMPLAINANT SHANNON GREENE (2 VERSIONS) (UNDISPUTED FACT)**

- The City produced two version of the same report with the same title ("Final EEO Investigation Report, Complainant Shannon Greene"), and both versions were placed in HR's personnel file regarding Ms. Greene. Both were labeled "Final." <u>Exhibit 23 #HR-Investigation Final; Exhibit 24 #HR Investigation-Altered</u>

- Neither version of the Final EEO Investigation Report, Complainant Shannon Greene was dated. There is no indication of when the report (2 versions) was begun or concluded. The investigation was completed in Nov. 2016 according to Ms Hawks but the

report had still not been delivered to the CVB in Feb. 2017 according to Mr Myers.

- BOTH VERSIONS ESSENTIALLY CONCLUDE THAT THERE WAS RETALIATION. Both versions have the same title and both versions are labeled "Final." Both versions conclude that Ms. Greene experienced unequal conditions of employment after reporting sexual harassment. One version concludes that the unequal conditions of employment were "retaliatory" and one version concludes that the unequal conditions of employment were not retaliatory, but that Ms. Greene's 2 managers merely punish and treat workers differently according to the managers' capricious preferences, and these caprices had impacted Ms. Greene after she reported sexual harassment for an unknown reason, and they had also impacted other employees who fell foul of the managers' favor. The "altered" version of the document that initially concluded "retaliation" appears to present all the same findings of vengeful acts against Ms Greene, but declines to call it "retaliation." The altered document merely alleges that without absolute proof of motive, it is *possible* that retaliation was not the motive, and that Ms Aragon and Mr Warren for some other reason (which they did not find in their investigation) decided to engage in vengeful acts against Ms Greene following her allegation of sexual harassment.

- City Attorney Marjorie Smith did not tell the EEOC about both versions. She stated that the Final EEO Investigation Report, Complainant Shannon Greene concluded "no retaliation" and she sent them only the one version that did not explicitly use the word "retaliatory" Exhibit #marjorie smith position statement available upon request (this exhibit is very lengthy) A simple FOIA request, fulfilled by the City Attorney's office (in other words, Ms. Smith's own office), found two "Final EEO Investigation Report" documents in Ms. Greene's HR file, and yet the City Attorney Ms. Smith appears to suggest that she was not aware of these two documents.

- Both versions were delivered to Ms. Greene in late 2018 as part of a FOIA request for the HR file regarding Ms. Greene. Exhibit #HR file-FOIA available upon request (this exhibit is very lengthy)

## LACK OF "CORRECTION OF ANY AND ALL" FORMS OF RETALIATION AS TITLE VII REQUIRES (UNDISPUTED FACT)

Ms Smith claims that there was no retaliation; therefore, no correction was needed. The City states that VIC training was not intended to correct retaliation and "there was no set agenda" and no agenda of correcting retaliation. Exhibit 25 #training-there was no set agenda Ms Greene continued to report retaliation, meaning that the training, which was not intended to stop retaliation anyway, also did not succeed in stopping retaliation; and the City continued to ignore all Ms Greene's reports of retaliation. Exhibit 7 #cliff-timeline When Ms Bowers of HR checked to see if any changes had been made in the CVB/VIC office, her handwritten notes state "no changes" Exhibit 26 #melissa interviews maria p. 4

The City of VB Position Statement makes no mention of any attempt by the City to correct retaliation.

A further training session took place in three parts from Dec. 2018 to Jan. 2019. The training focused on a personality test (DISC), expressing frustrations out loud, and written City policies regarding attendance and clothing (but not policies regarding violence, EEO issues, or retaliation). The words "retaliation" and "assault" were never mentioned in the trainings, nor any words with similar meanings; and the training was used by HR Trainer Patricia Greer to incite anger against Ms Greene rather than diffuse it. In fact, the trainings included Ms Greer assigning a co-worker to "act like Ms Greene" in front of everyone: co-worker Sarah Vitz acted like a perfectly reasonable, professional employee, but the assignment could appear to be humiliating and could have gone differently. Seats were not assigned except for Ms Greene, and Ms Greene was assigned to sit between two of her assailants in the dark "to get out of her comfort zone." The training session did not purport to be a correction of retaliation or assault. In the preliminary interview before the 3-day training (a training that had nothing to do with correcting assault, correcting retaliation, or any other EEO issue), when Ms Greene said she can't work with assault and battery, HR trainer Patricia Greer told Ms Greene to "tell herself" that she "CAN work with assault and battery." Exhibit 85 # patti tell yrself you CAN work with battery

Title VII requires thorough correction of "any and all" forms of retaliation and discrimination.

## RETALIATION AGAINST MS. GREENE IS CONCEDED AND SPELLED OUT  IN TWO CITY OF VB HR DOCUMENTS  (UNDISPUTED FACT)

The two documents are:

- Director of HR Regina Hilliard's Letter dated 8-16-2016 to the CVB  Exhibit 27 # Regina Hilliard Letter

- Final EEO Investigation Report, Complainant Shannon Greene, undated (concluding that there was widespread "retaliatory" behavior toward Ms Greene by Ms Aragon and Mr Warren)  Exhibit 23 #HR-Investigation Final

- Ms. Hilliard's letter stated that Mr Warren, Ms Aragon, and the CVB appeared to be engaging in retaliation, and Ms Hilliard provided evidence for her conclusion. Ms Hilliard directed the CVB to "scrutinize" for further evidence of retaliation. According to Mr Myers' notes, the CVB did not engage in any scrutiny. Exhibit 7 #cliff-timeline and Human Resources did not follow up.

- The Final EEO report directed the CVB to make changes to stop retaliation against Ms. Greene. When Ms. Bowers asked if the changes had been made, she wrote a note next to her question and wrote: "No Changes." Exhibit 26 Melissa interviews Maria, p. 4

- Despite these two documents that explicitly stated, with evidence, that Ms Greene was being retaliated against, and Ms Bowers' notes, the City's Position Statement argues that there was no retaliation.

## JOB APPLICATIONS/TRANSFERS 100% DENIED AFTER SEXUAL HARASSMENT COMPLAINT (UNDISPUTED FACT)

- Ms. Greene applied for exactly 2 City jobs in 2015: Visitor Information Assistant (VIA) and Police Officer Recruit (POR); and she applied to 13 City jobs from 2016-2018. Exhibit 15 #jobs-timeline

- Ms Greene applied for the 2017 job opening of ADMIN TECH (Visitor Center Supervisor), and was declined by the HR dept. for the reason "no experience creating work schedules." Ms Greene writes work schedules (known as "rotation" schedules) for the City of VB, as the HR dept was aware. These work schedules are mentioned numerous emails between Ms Aragon and Ms Greene. Exhibit 28 #Work Schedules ie rotations

- Of the 13 of job applications that Ms. Greene submitted after reporting sexual harassment, 13 out of 13 were denied, for pretextual reasons provided by the HR dept. that included "no experience with MS Office." "no experience meeting deadlines," "no experience supporting an Executive," "no experience writing work schedules," "no experience with databases." Nearly all the reasons were false. Ms. Greene's resume, application materials, and/or online applications indicate that she had extensive experience with MS Office; extensive experience meeting deadlines; she was the Executive Assistant to the owner of a company; she had experience writing work schedules that were discussed in emails between the HR dept. and Ms. Greene; and she had experience with databases, which was highlighted by the City of VB (Parks and Rec dept.) as a particular strength of Ms. Greene in one job application, but a reason for denial in another application. Exhibit 17 # job apps-evidence of qualifications

## THE VBPD AND HR/OHSS MADE OTHER UNSUCCESSFUL ATTEMPTS TO TERMINATE MS GREENE'S EMPLOYMENT IMMEDIATELY AFTER CAPT. JONES LEARNED THAT MS GREENE, A NEW VBPD HIRE, REPORTED HIS OFFICER INV. KAUFMAN FOR SEXUAL HARASSMENT (UNDISPUTED FACT)

- Ms. Greene signed a job offer conditional upon meeting certain criteria, and then met all those criteria and received an email stating that she had met all criteria would soon receive a final letter of employment. Exhibit 29 #VBPD Congratulations email Stacy Hawks of HR had intervened and told the VBPD that Ms Greene complained about being sexually harassed. In a misunderstanding" or "confusion" or "appearance of impropriety" (the City stated all 3), the City at first stopped Ms Greene's application and then the application moved forward. This

was the first of 7 attempts to halt Ms. Greene's VBPD employment application. Ms Smith states in the City Position Statement that all Police Officers who interviewed Ms Greene prior to the Pre-Screening Panel (the panel when they heard about sexual harassment from Ms Hawks) recommended Ms Greene for employment as a Virginia Beach Police Officer.

- All 7 attempts to terminate her employment occurred after Ms. Greene reported sexual harassment at the CVB and Ms Hawks intervened. The reasons are shifting sands: <u>each time a reason turned out to be mistaken, the City produced a new reason.</u> <u>Exhibit 30 #seven illegal attempts; Exhibit 31 #Ultimatum letter; Exhibit 32 #PA-my decision-my answer is NO; Exhibit 33 #Scott Kalis-not cleared by PCP</u>

    - In early 2017, Ms. Greene requested to know the procedure for a possible injury deferment. From the point of that request to when Ms. Greene was scheduled to begin the Police Academy in Sept. 2017, Ms. Greene was physically examined and/or tested one only one occasion by the City of VB (VBPD), and Ms. Greene passed that exam. <u>Exhibit 34 #PAT, p. 4</u> In that exam (2nd PAT exam), Ms. Greene ran faster and did more push-ups that in her first PAT examination, exceeded the standards set for new PORs, and <u>exceeded her physical abilities prior to being injured.</u> <u>Exhibit 34 #PAT, p. 3</u> Ms. Greene's GP doctor Dr Winters and  doctor treating her foot Dr Prom both approved Ms Greene for full duty for the Sept. Academy and the City of VB had those letters on file. <u>Exhibit 35 #Dr Winters; Exhibit 36 Dr Prom Full Duty Letter</u>

    - Physician Assistant (PA) Tammy Avila was scheduled to meet with Ms Greene at HR's requirement (the requirement was created by Michele Borden of OHSS, who had made age-discriminatory comments before removing Ms Greene from the March Academy and telling Ms Greene the opposite). Ms. Greene attended the appointment, but the PA never conducted a medical examination or physically examined Ms. Greene in any way. The PA's exam notes state "No Exam Today" <u>Exhibit 37 #PA Exam-9-18-2017</u> The PA also later states by email to Ms Bryant that no exam took place. There is significant disagreement about the authenticity of the PA's notes: it appears that the PA went back later and wrote notes. One comment in the PA's notes can be proven false: "None of the 3 doctors I've seen will clear me for the police academy" <u>Exhibit 37 #PA Exam-9-18-2017, p. 2</u> City of VB OSHS had on file two notes from Ms Greene's two doctors (she has 2, not 3) both clearing Ms Greene for full duty.  <u>Exhibit 36 #Dr Prom Full Duty Letter; Exhibit 35 # Dr Winters Full Duty Letter</u> Dr Fink, mentioned in the PA notes, never examined Ms Greene's foot, never wrote a limited duty note, and has almost nothing to do with Ms Greene.

    - The PA admits to not physically examining Ms. Greene <u>Exhibit 34 #PAT, p. 1</u> and admits to making a negative comment about Ms. Greene's age at their meeting. She admits to not knowing the VBPD fitness requirements. City Attorney Ms Smith concedes that the age comment was made by the PA, and so does the Director of OHSS. <u>Exhibit #marjorie smith position statement available upon request (this exhibit is very lengthy)</u>

- The medical exam that the PA conducted must, according to VBPD Hiring Policies <u>Exhibit 38 #Hiring Policies of the VBPD</u>, be based on the Human Performance Systems guidelines. <u>Exhibit 39 #Human Performance Systems</u> The Human Performance Systems (HPS) guidelines, 49 pages long, do not mention burpees. <u>The VBPD Hiring Policies do not allow the PA to speculate regarding a Police Officer Recruit's physical abilities.</u> <u>Exhibit 39 #Human Performance Systems</u> She can only interpret a Physician's opinion. Scott Kalis Director of OHSS stated that the PA's scope is to <u>interpret documents</u>, not venture opinions or provide advice. <u>Exhibit 40 #Scott Kalis emails</u> p. 3. If an exam is conducted, it must, according to the VBPD hiring guidelines, follow the HPS guidelines. However, no exam was conducted. And the OHSS was so eager to fire Ms Greene that prior to the exam date, Ms Borden of HR/OHSS, who made age discriminatory remarks too, and was unflaggingly hostile toward the new VBPD Hire Ms Greene, had already failed Ms Greene for the exam appointment before the appointment even took place. <u>Exhibit 41 #michele borden 9-16</u>

- According to Capt. Jones, typical Academy running is 10 miles per week, and a longer 5 mile run is "unusual": most runs are shorter: in other words, Ms Greene would have had no problem. Also, the <u>VBPD could not agree about the number of burpees required at the Police Academy.</u> Before the medical exam Lieutenant Brett Burnett said 300 burpees per day and after the medical exam Ms Greene received an email in which Capt. Jones said 100 burpees per day. <u>Exhibit 42 #police academy exercise requirements</u> The PA was not interested in hearing the accurate numbers and made her decision based on a number of burpees (300) that Capt. Jones disagreed with, and running estimates that exceeded what Capt. Jones said was typical for the Police Academy. Capt. Jones out-ranks Lt. Burnett and is the Director of the Law Enforcement Training Academy. If the PA wanted to speculate about Ms Greene's fitness, which she is not allowed to do anyway, <u>she should have followed Capt. Jones' guidelines, not Lt. Burnett's</u>. The PA made no attempt to find out accurate fitness requirements either before or after the medical exam, and fitness is beyond the scope of her authority. The HPS guidelines do not mention burpees, the Hiring Guidelines say that burpees cannot be a measure for the medical exam because they are not in the HPS guidelines, and the same HPS guidelines emphasize testing shorter runs at higher speeds because this is more relevant to police work. That is why the PAT exam is a 300 meter run that must be run at 6 miles per hour. Ms Greene, in August of 2017, ran that distance at 11.2 miles per hour. The PA also said during the "medical exam" appointment that Ms Greene's heart, blood pressure, chest x-ray, lung capacity, and hearing, which were all tested, were "great." The PA made one comment, in addition to her age comments, that clarifies that <u>she had no intention of allowing Ms Greene to pass the medical exam</u>, and that she was not interested in any facts or reality: she stated that "burpees will" (not can, but will) "reinjure you" (meaning Ms Greene) because a "stress fracture can become a break." <u>Exhibit 43 #PA exam-SG notes</u> This is medically inaccurate: a healed and calcified stress fracture from 17 months earlier cannot become a break; and the PA never saw Ms Greene's x rays anyway. Dr Prom clearly described calcium deposits (indicating stress fractures <u>that had healed</u>) in Feb. 2017 in exactly the area where there had previously been foot pain, and the City of VB OHSS, and the PA, had these notes on file. <u>Exhibit 44 Dr Prom Notes Feb 2017</u>

• The PA ordered Ms Greene to wear a boot cast in order to fully rest her feet. No doctor made any similar order (after Feb. 2017). Mr Kalis stated "my staff are not treating physicians" Exhibit 40 #Scott Kalis emails p. 3 and in this light the PA's requirement was not permissable. Nonetheless Ms Greene complied, went home, wore her boot cast, and emailed the PA to state that she had complied. Exhibit 32 #PA-my decision-answer is NO The PA provided no reason permitted by the Hiring Rules of the VBPD for denying Ms. Greene admittance into the Police Academy.Exhibit 38 #Hiring Policies of the VBPD

    • The PA refers to her decision as "my decision" and "the answer is NO" (the PA used capital letters for "no"). Ms Greene's paperwork clearly states that Ms Greene's foot is anatomically correct, the bone fractures are healed, and her two doctors believe she can fully function at the Police Academy. Exhibit 44 #Dr Prom notes Feb 2017; Exhibit 36 #Dr Prom Full Duty Letter; Exhibit 35 # Dr Winters Ms Greene easily passed the PAT fitness exam twice, and the PAT exam is the VBPD's only measure of whether or not someone is fit for the Police Academy. Injuries must be approved by a treating physician, i.e. Ms Greene's two doctors Dr Winters or Dr Prom.Ms. Greene took notes at the same meeting. Exhibit 43 #PA exam-SG notes

    • Ms. Greene was physically removed from the Police Academy auditorium at the command of Mr Jones and was denied entrance to the Police Academy.

• The PA's notes mention a "Dr Fink." Dr Fink walked by Ms Greene one day at work, struck up a conversation about non-medical topics, mentioned that he was a doctor and a foot specialist, and when Ms Greene said had suffered a foot injury, he offered to examine her foot. He never actually examined her foot. He is not Ms Greene's treating physician, he is not Ms Greene's Primary Care Physician, he never saw Ms Greene when she was injured or examined her injury; he has never seen her foot or tested her foot for Police duty; he never wrote a light duty note or any note of any kind.

• Prior to these events, the HR dept. had received information that Ms. Greene had reported Ed Salamosky for sexual harassment and had effectively "blackballed" Ms Greene, denying all job applications. Also prior to these events, Captain Jones of the VBPD had for the first time received information that Ms. Greene reported VBPD employee Tim Kaufman for sexual harassment. Exhibit 21 #reporting Inv Kaufman Immediately upon receiving the information that Ms Greene reported sexual harassment, Capt. Jones sent Ms Greene an ultimatum letter by post, threatening to terminate Ms Greene's employment if impossible conditions were not met. Exhibit 31 #Ultimatum letter The letter is trumped up: The VBPD tried to call Ms Greene by calling back a number she had called from but did not even try using Ms Greene's telephone number on file, then they claimed she was unreachable, and claimed this was a reason to fire her, etc.

• Scott Kalis investigated the PA's age remarks to Ms Greene, determined that what Ms Greene alleged was true, and then explained that he agrees with the age remarks. What the ADEA does not allow is for Ms Borden's and Dr Avila's age-discriminatory remarks to be paired with

firing Ms Greene without cause. Hiring decisions, according to the EEOC, cannot be made based on stereotypes about age. Ms Borden, who also made age discriminatory remarks earlier, had already signed the paperwork to fire Ms Greene before Ms Greene attended the appointment. Exhibit 41 #michele borden 9-16 City Attorney Ms Smith repeats the PA's age discriminatory comments, and argues that in Ms Smith's opinion she agrees that people who are older have bones that heal more slowly. Ms Greene's bones were fully healed so the comment is irrelevant, the PA never had Ms Greene do any exercise; and notes on file at the OHSS stated that Ms Greene's bones were fully healed and anatomically correct. Any lingering foot issue had nothing to do with bones. Ms Smith's logic is faulty. The fact that a statement is true does not make it non-discriminatory. Mr Salamonsky's comment, essentially, "You can make money by working for Playboy" is also true but that does not mean that it is non-discriminatory.

- **RECKLESS ENDANGERMENT, ASSAULT, BATTERY, and DEPRAVED AGGRAVATION OF AN INJURY WERE ALL REPORTED IN WRITING (UNDIPUTED FACT) AND NOT INVESTIGATED FOR 2 ½ YEARS (APRIL 2016-SEPT 2018), AND NO CORRECTION WAS EVER MADE (UNDISPUTED FACT)**

    - Ms. Greene reported 9 assaults in writing and 3 assaults orally, for a total of approx. 12 assaults against Ms. Greene 2016-2018, with the most open definition of assault. This includes milder assault forms such as vehicle bullying and putting a finger in Ms. Greene's face, tailgating her aggressively on Route 264 as she left work, as well as the more severe forms of assaults such as kicking in the knee, punching her leg, kicking her leg, and of course choking her. Exhibit 45 #assaults and when sg reported them; Exhibit 72 #selected assault reports

- The City declined to fill out the requisite Workplace Violence forms for approx. 10 assaults against Ms Greene. Ms. Bowers interviewed Mr Myers and asked him why he never filled out a Workplace Violence form.Exhibit 46 #melissa-cliff-why no workplace vio He had no response.

- Upon both request from the CVB and FOIA request in the fall of 2018, it became clear that no Workplace Violence form had ever been filled out in the entire CVB regarding Ms Greene: that means Ms Aragon, Mr Warren, Mr Myers, and Ms Kephart never filled out a form they should have filled out multiple times. Exhibit 19 #workplace vio-never filed by cvb

- Only after Ms Greene contacted the City Manager Mr Hansen in the fall of 2018 following a particularly vicious battery (kick in the knee), Mr Myers filled out a Workplace Violence form. Mr Hansen, Mr van Dommelen (Director of the CVB), and Mr Myers exchanged childish emails and photos of Ms Greene and wrote comments making fun of Ms Greene, and Mr Hansen wanted Ms Greene, not Ms Ward, reported to the VBPD and wanted someone to have a "sit down" with Ms Greene. (part of the lengthy CVB-FOIA file; available upon request) ###

- The City of VB found (Final EEO Investigation Report, both versions) that Mr Myers and Ms Aragon intervened in a negative way in the social acceptance and "onboarding" of Ms. Greene as a "team" member in her office.

• Two co-workers told Ms Aragon that they were driving in their vehicles on City property in ways that endangered Ms Greene. The fact that they would even want to tell Ms Aragon is indicative of the consistent pattern of Ms Aragon praising and rewarding anyone who expresses anger at Ms Greene, a pattern that HR (Ms Greer) personally witnessed at a staff meeting and expressly permits. In emails, Ms Aragon praised the bullies and criticized Ms Greene for reporting bully incidents. Exhibit 50 #maria sides with bullies Mr Kuhlman also praised Ms Breslin after she assaulted Ms Greene ### Ms Aragon also praised Judy for coming at Ms Greene with her hands in fists (for parking in her favorite parking spot), and praised Ms Hiltibran for getting so angry at Ms Greene (for making the lunch room smell like canned tuna fish) that Ms Hiltibran dumped an upside down garbage can in the sink and left it there, not to wash it, but to show how angry she was at Ms Greene. Mr Warren praised Ms Colleen Cullen for banging angrily on Ms Greene's car over and over with Ms Greene sitting quietly inside, being told by Ms Greene to leave, and continuing to bang in her car anyway.

• Ms. Greene reported in writing that both of her two managers endangered her in a violent incident involving an illegal rat trap. Exhibit 72 #selected assault reports Mr Myers admits to receiving that report and not acting on it. In a "timeline" (that veers from the truth in many particulars), Mr Myers appears to admit freely that he ignored one retaliation report after another including the illegal rat trap. Exhibit 7 #cliff timeline

• Endangerment and Aggravation of an Injury: Ms. Greene reported that both of her two managers endangered her by ordering her to hurry and at the same time placing obstacles around a doorway in May of 2016. Ms Greene injured her left foot, apparently due to the obstacles being there, limped, could barely walk, was in immense pain, and stress-fractured several delicate bones, as x-rays show. Ms Hawks ordered Ms Greene to Building 18 at the municipal center for no reason, and again to the Towne Bank Building, while Ms Greene was on Limited Duty for her foot, Exhibit 51 #stacy defies limited duty  In addition, the OHSS Dept. sent Ms Greene back on full duty without any doctor approval. There is no record af a doctor-approved return to full duty for May of 2016.

When assault and battery by Kathie Ward was investigated. Ms Greene objected in writing that the investigation was biased, that the investigators were investigating themselves (because Mr Myers in an email broadened his investigation to the entire "Culture of Retaliation"). In documents, Ms Ward admitted to choking Ms Greene. Three different people other than Ms Ward more or less agree on the facts of some kind of physical incident by Ms Ward that "went to far," for which Ms Ward "apologized" and that involved possibly "hurting" Ms Greene. Only Ms Ward's account is different; everyone else agrees. Exhibit 47 #Kathie Ward Battery-3 accounts agree; Exhibit 76 cliff-email and report-kathie assault Later, in the Breslin assault investigation, 3 accounts agreed; only Ms Breslin told a different story. Exhibit 93 breslin assault-3 accounts agree

City Policy 6.06 regarding Withdrawals

Ms. Smith appears unaware of the City policy 6.06 specifics when she argues at length (incorrectly) that the City in one instance did not violate Title VII because Ms. Greene "withdrew" her allegations: in addition to this statement by Ms. Smith being untrue, Policy 6.06 does not allow withdrawals by the complainant once an allegation has been made.  Exhibit 52 #policy 6.06

### Using Taxpayer Money to Find Out if Ms Greene is a Homosexual

In Sept. Of 2018, Ms Greene reported Ms Ward for assault and battery. In Ms Ward's version of events, Ms Ward, an unathletic, overweight, uneducated, unreligious woman 15 years older than Ms Greene with a criminal record, stated (falsely; in an angry handwritten document) that Ms Greene was homosexually attracted to her, and she wrote a made-up homosexual story in a restaurant, Bella Pizza. For the second time at the City of VB, an employee made up a sexual scenario involving Ms Greene, put it in writing, and with HR approval distributed it to other employees. Ms Greene went back to the restaurant. The waitress Symbat at the restaurant Bella Pizza on Va Beach Blvd. said she did not see any intimate touch and said she did not have the impression that Ms Greene was in love with Ms Ward at all: on the contrary, Ms Ward was bragging about Ms Greene to the waitress. The staff at Bella Pizza also re-printed the receipt from the meal. Additionally Ms Ward had sent Ms Greene borderline amorous notes and gifts, not the other way around.

Mr. Myers wrote a highly biased report and disparaged Ms. Greene in multiple ways in emails surrounding the investigation of Ms Ward's battery.  Mr Myers' "conclusions" are identical to Ms Ward's assertions, not Ms Greene's; despite that fact that three accounts (Ms Benegar, Ms Cullen, and Ms Greene; as well as an account by Ms Aragon of a conversation with Ms Ward) were more or less in agreement; and only Ms Ward told a very different story. Mr Myers ignored a signed confession. Instead Mr Myers ordered a report of all the times Ms. Greene had "touched" Ms Ward both at work and outside of work, with no restrictions given as to the kind of touch he was looking for. Mr Myers explained in his investigation report that he ordered the report out of relationship curiosity, to get a sense of their "relationship." Exhibit 76 Cliff-email and report-kathie assault, p. 3 Mr. Meyers also widely distributed Ms Ward's document alleging Ms. Greene to be a homosexual. Ms. Ward then falsely attributed to Ms. Greene a "fantasy" list of touch scenarios, none of which ever occurred (touching her neck, touching her arm, then touching her arm again). Exhibit 56 #Touches-request by cmte9-13-2018 Ms Greene did not engage in any of the alleged touches nor would she be likely to. Two of the alleged intimate touches can be proved to be false: Ms Greene cannot scratch anyone due to very short nails from jiu jitsu; and arm rashes are not treated by acupuncture to the arm; since Ms Greene does not perform acupuncture, she had to look this up. The fantasies by Ms Ward, like the fantasies by Mr Kaufman, are from the sexual imagination of the authors and have nothing to do with Ms Greene; in fact, Ms Ward and Mr Kaufman both have weird fantasies by most standards.

Mr Myers made it very clear that he ordered the "touches" list to find out the physical nature of Ms Greene and Ms Ward's "relationship," and not because he wanted to investigate Ms Ward's battery. He mentions the document in a section exploring their relationship.

## Culture of Sexual Harassment

75% of the City of Virginia Beach's Workplace Sexual Harassment  Policy Statement is routinely ignored in actual practice Exhibit 53 #Policy-harassment VB 6.13-with stats

### Human Resources and VBPD "Mistakes" Regarding Ms Greene

Ms. Greene was evidently "blackballed" by the HR dept. as punishment for reporting sexual harassment. As stated above, Ms. Greene received 0 out of 13 or 0% of jobs she applied to after reporting sexual harassment Exhibit 15# Jobs-Timeline of Jobs Applied to; in addition to other HR mistakes, all disadvantageous to Ms Greene. Exhibit 54# Mistakes by HR  Human Resources was supposed to remove Ms Greene's 2016 P.I.P. disciplinary action, Exhibit 86 # pip-supposed to be removed but it was still in her file when she requested her file by FOIA in 2018. The VBPD "mistake" about a treating physician's note was never corrected. The VBPD Inv. Kaufman Background Investigation Report, sloppily written, filled with errors, and containing sexual content, was never removed from Ms Greene's permanent record. Another report by Inv. Irving added on to the Kaufman Report but did not replace it. Exhibit 84 #kaufman report was never removed; Exhibit 80 #Kaufman Report and Analysis of Errors

### CVB Responses to Other People who made EEO Complaints

From approximately 2015 to present, complaints by three women other than Ms Greene about age and gender discrimination at the CVB/VIC were suppressed by the human resources department, and according to Kathie Ward (whose close friend Karen Kaephart works in CVB HR), the HR dept. got tired of listening to their complaints, and Mr Warren was brought in as the the VIC as manager to "take care of the problem" by "harassing the women until they quit." Whether this is true or not, it is a fact that all three employees, all women and all over the age of 40, left City of Va Beach CVB employment (Ms Ward said they were forced out) by 2017. Their names are Gigi, Sue, and Catharine Dunn. According to Ms Greene's co-worker Charlotte Rogers, An employee named Hester Waterfield was sent to the CVB/VIC office because she was older and the CVB was trying to "push her out."

### Assault and Battery; Accessory to Assault and Battery after the Fact

Catharine Dunn wrote an email stating how patient and nice Ms Greene is. Ms Greene helped Ms Dunn with technology. Ms Aragon told Ms Dunn she does not like Ms Greene, and Ms Aragon stopped Ms Greene from helping Ms Dunn. After a while Ms Dunn, without provocation, punched Ms Greene in the leg. Ms Greene reported the assault to Mr Myers and to Ms Kephart. Ms

Kephart wrote the strange remark: "No Incident with Catharine Dunn" in her notes.###

Colleen Cullen, a part-time worker, banged on Ms Greene's vehicle door repeatedly approx. 15 min before work and would not leave when asked, but instead continued banging on the vehicle window angrily, with Ms Greene inside. Mr Warren praised Ms Cullen's actions in an email.

Peggy Breslin has worked for the CVB for approx. 20 years and until recently was assigned to work only at a location convenient for Ms Breslin. On 9-13-2016 Mr. Warren and Ms. Aragon learned that Ms. Breslin had a conversation with Ms. Greene in which she assisted Ms. Greene with her grievance. At the next staff meeting (10-18-2016), Mr. Warren announced that Ms. Breslin, after years of working only at her branch location, would now be working at the VIC and soon after, Ms. Breslin began to be assigned undesirable weekend shifts. Exhibit 55 #peggy punishment for helping Ms. Greene Ms. Breslin was angry about the new assignments. Ms. Breslin later assaulted Ms Greene.

Ms Ward went to Ms Aragon in August of 2018 and said that she felt punished by Ms Aragon for being friends with Ms. Greene. Ms Aragon essentially said yes, that's the way it is. Shortly after meeting with Ms. Aragon, Ms. Ward viciously assaulted Ms. Greene.

Judy Benegar approached the seated Ms Greene with her hands (Ms. Benegar's hands) in fists, shouting, furious and evidently ready to start a fight (over a parking space). Ms Greene stood up and rapidly placed a chair between herself and Ms Benegar. Ms Greene reported the assault to Mr Myers, Mr van Dommelen, and, in her interview process, to the VBPD. Ms Aragon praised Ms Benegar for the event and publicly stated that no one can park in Ms Benegar's spot (parking spots are not assigned).

CVB and VIC Management praised, and continues to praise, co-workers who bully and assault Ms. Greene; while at the same time punishing any co-worker who becomes Ms. Greene's friend. At the same time Mr Myers makes sure that no Workplace Violence forms are filled out. Mr Kuhlman, Ms Myers and Central HR meet with VIC staff and stir up anger against Ms Greene. This strategy by management creates a foreseeably dangerous crucible.

<u>Altered Documents</u>

The "altered" Final EEO Investigation Report relating to Ms. Greene is not an isolated incident. There appears to be another "altered" document relating to Ms. Greene in which Ms. Borden fired Ms. Greene on the basis of a medical exam, except that she fired Ms. Greene *before* the medical exam took place. The scanned document (a scan of a copy) clearly shows that the date appears to have been altered by Ms. Borden, but some detail is lost in the scanning process. In a copy of the the original document, which I can present to the Court, the date appears to have originally read "8/16/17" and was sloppily altered to look like "9/16/17." Exhibit 41 # Michele Borden 9-16 This document was requested from OHSS by the City Attorney in early 2018. A date of "8/16/17" means that Ms. Greene "failed" a medical exam long before the exam occurred.

However, on 9/16/17, the *altered* date, Ms. Greene still had not had her medical exam. This means that Ms. Borden definitively failed Ms. Greene for an exam she had not yet taken. Someone appeared to <u>alter the date to obscure that Ms Borden had engaged in misconduct,</u> but <u>did not alter the date enough,</u> and the altered date she gave was <u>still</u> before the actual date of the medical exam: 9-18-2017.

### Position Statement - problems

For a page-by-page analysis of Ms. Smith's Position Statement and its continual presentation of factual misinformation, see <u>Exhibit 57 #Analysis of city position statement</u>. Ms. Smith relies heavily on quotations that she claims were said by Ms. Greene. For a list of those mis-quotations, see <u>Exhibit 58 #Quotations that are made up</u>

### Ms Hawks' Demand that Ms Greene

### "Must" Withdraw Her Retaliation and Violence Complaints or Else Be Fired

Ms. Greene met with Stacy Hawks on 5-9-2016 and Ms. Hawks got angry and demanded that Ms. Greene retract her written allegations of 1. violent comments by Mr Warren and 2. retaliation for reporting sexual harassment. Ms Greene declined. The next time they met at Ms. Hawks' bidding, Ms Greene was visibly injured and on light duty. Ms. Hawks directly threatened Ms. Greene's job and said she needed the retractions immediately. Ms. Bowers' notes attest to Ms. Hawks' job threat and demand that Ms. Greene retract her allegations. <u>Exhibit 59 StacyHawks demanded a retraction</u> Because Ms. Hawks did nothing about the violent comments and retaliation, two violent incidents occurred within two months, and Ms. Greene ended up with a permanently injured foot.

An email by Ms. Greene to Ms. Hawks of HR on 5-22-2016 (after the 5=9=2016 meeting) states "I genuinely believe that retaliation for reporting sexual harassment is the entire motive for how I am treated." <u>Exhibit 60 #Retraction email-highlighted</u> Policy 6.06 disallows retractions. CVB Director Brad van Dommelen did not believe that Ms. Greene withdrew her reports of retaliation: he mentioned retaliation in his 9-27-2016 letter to Ms. Greene. <u>Exhibit 61 #brad letter</u> Please note that in that letter Mr Van Dommelen committed to changing Ms Greene's negative performance evaluation, but then no one actually changed it, and the PIP that came out of the performance evaluation is still on Ms Greene's record to this day and was not removed as promised.

### The City Attorney's Office Joins in the Retaliation (FOIA)

The City began shunting document requests written from Ms Greene's City email, for documents that other employees received for free, to the City Attorney's FOIA office. Her emails got sent to FOIA and Ms Greene was charged without receiving prior permission from Ms Greene. They claimed she was writing in her capacity as a citizen, not a City employee, but Ms Greene was writing from her City email with the CVB Logo. <u>Exhibit 79 #foia-using foia to retaliate</u>

### Mr Kuhlman Stirring Up Discontent

The Sept. 2018 investigation of Ms Ward's particularly vicious incident of battery against Ms. Greene at the VIC on 8-30-2018 was exploited by the CVB to make Ms. Greene's situation even more dangerous. Mr. Kuhlman stirred up discontent by interviewing Ms. Greene's most hostile co-workers and soliciting reports of "their problems" with Ms. Greene, encouraging them to air their discontent. Ms Greene did not purchase FOIA documents regarding Mr Kuhlman's meetings, but the price estimate alone is evidence that Mr Kuhlman held multiple meetings ###

### Investigator Kaufman's Negative Bias

In addition to a sexual focus, Exhibit 22 #sex in the kaufman report the Background Investigation Report of Ms Greene by Investigator Timothy Kaufman has an extreme negative bias toward the applicant, supported by inaccurate statements. There are five substantive factual mistakes in the first paragraph. All five mistakes reflect poorly on the applicant, whereas the correct facts would have reflected positively on the applicant. There are approx. 87 Significant Errors and Misquotations by Investigator Kaufman in his background investigation report. Of these errors, 98.9% reflect negatively on Ms Greene.

Four Skill Areas that the VBPD looks for in its police applicants were identified by Sergeant William Gervin, Inv Kaufman's supervisor, who spoke to the Citizen's Police Academy including Ms Greene on Sept. 20, 2016: shooting skills, driving skills, integrity, and ability to make decisions under pressure. Investigator Kaufman undermined all four major skill areas for police applicants by omitting key information and/or providing inaccurate "facts" about Ms Greene in exactly those important skill areas. For Inv Kaufman's report and its errors, see: Exhibit 80 #Kaufman Report: Analysis of Errors

### Inv. John DiPilato

Inv. John DiPilato was present at Ms Greene's Background Investigation interview and does not remember Ms Greene saying anything about being pinned to a wall in some kind of a sexual way and being injured. He sounded quite certain that Ms Greene had not said that, lending further credence to the view that Mr Kaufman made up this sexual attack involving Ms Greene. Exhibit 66 #DiPilato tel call redacted I redacted the exhibit to remove Inv. DiPilato's cell phone number.

### Misunderstanding What Sexual Harassment Is

Ms. Greene herself stopped Ed Salmonsky's sexual harassment with a firm email.The City's emails express praise, admiration and excuses for Mr. Salamonsky's behavior. Even HR's EEO investigation, the altered version, calls the sexual harasser "sincere" and "guilty of nothing more than a poor choice of words." Exhibit 24 #HR investigation Altered

Mr Myers re-designed the CVB Policy statement while Ms Greene was being retaliated against;

and Mr Myers listed "not engaging in sexually harassing co-workers" as a form of "courtesy" under the Courtesy heading. Exhibit 62 #policy-not understand harassment

Ms Aragon thought that if Mr Salamonsky were going to sexually harass someone it should have been her, as though it were a competition to be sexually harassed and Ms Aragon wanted to win. These remarks, by CVB and VIC management, and also by HR, seem to fundamentally misunderstand what sexual harassment is, how destructive it is, and why it is illegal.

## Safety

In addition to the depravity of how Mr Myers, Ms Hawks, Ms Aragon, Ms Kephart, and Mr Warren City treated the injured Ms Greene, the City's uppermost levels of management were also unresponsive after Ms Greene sent emails requesting physical safety from assault.

Exhibit 49 #help me-emails about safety Instead they exchanged puerile remarks about Ms Greene such as "You've got to read this one" Exhibit 71 #Brad's puerile remark  Exhibit 70 #dave hansen involving the vbpd: I ask the Court to consider the failings of City leadership with regard to the OSH Act.

## Other Discrimination

A Virginian Pilot article featured the City Manager Mr. Dave Hansen and Ron Williams, Deputy City Manager, and Brad van Dommelen, Director of the CVB, engaging in text messages that the newspaper suggested are possibly racist. They were texting about African-Americans, called them "5%-ers," and texted about what music they were playing. These three men are all in Ms Greene's chain of command and were overseeing and condoning sex discrimination, retaliation, and battery of Ms Greene at the same time they were sending those text messages. There is an immaturity about the leadership structure. Exhibit 68 #Five percent Virginian Pilot article Ms Greene also reported City of VB Parks and Rec patrons who made loud racist and sexist comments at a City-run gym day after day, and no City employees stopped them, although they monitored other behavior. Another Virginian Pilot article reported that when City of VB HR discovered that some firefighters got promotions and raises based on cheating on exams, the HR dept. agreed they had cheated but made no corrections. Exhibit 69 #Firefighters All these events are from the same time when Ms Greene was undergoing repeated acts of discrimination. The various articles and different offices paint a consistent picture of City of VB government in which discrimination and other misconduct occurs, the HR dept. does not correct wrongdoing, and the higher levels of management condone the discrimination.  The HR dept. was very aware of Mr Myers, who asserted that he is Ms Greene's HR Representative, Exhibit 77 cliff-hr representative., and very aware of what he was doing.

## Honesty

In the DISC personality assessment, all VIC employees were assessed and only Ms Greene was assessed to have "honesty" as a personality trait. Exhibit 81 HONESTY-DISC Ms Greene's Polygraph assessed her as 99.4% truthful for the questions that are asked to all applicants. Exhibit 87 Polygraph Ms Greene's internal charges of EEO and ADEA violations, a small percentage of which were investigated by the City of VB, were all found to contain accurate information : Ms Bowers and Ms Hilliard found the retaliation charges were truthful, Ms Colleen Cullen confirmed she had assaulted Ms Greene as described, two witnesses confirmed Ms Greene's description of Ms Breslin's assault, Mr Kalis confirmed that Ms Avila made the comment about Ms Greene's age that Ms Greene said she had made, etc. Multiple different sources confirmed the honesty of Ms Greene's reports.

### Dates on Which Ms Greene Reported Retaliation

Retaliation was reported in writing to the CVB and/or Human Resources on many dates including: 4-23-2016, 5-15-2016, 7-21-2016, 10-5-2016, 11-14-2016, 1-26-2017, 7-27-2017, 8-9-2017, etc. These reports described:
- Making up rules spontaneously
- One set of rules for Ms. Greene, and one set for everyone else
- Maria Aragon and Scott Warren's obsessive, harrassing focus on Ms. Greene
- Inappropriate and Derogatory comments about Ms. Greene
- Different uniform enforcement for Ms. Greene
- Repeatedly putting garbage in Ms. Greene's hand and no one else's
- Encouraging Ms. Greene to work somewhere else
- Repeatedly making Ms. Greene stay past 5 pm and letting other co-workers go home in similar circumstances
- Excessive reprimands over trivia (3 meetings about an exclamation point)
- Reprimands of Ms. Greene for very small errors while allowing and condoning enormous errors by other employees
- Reprimanding Ms. Greene loudly in public
- Not allowing Ms. Greene the same use of facilities as other co-workers
- Mocking and repeating Ms. Greene's words in a funny voice

### Small Retaliation

The emotional/career impact/health impact of Large Retaliation (assaults, job denials, etc.) is profound and devastating.  The daily Small Retaliations are also extremely humiliating, degrading, stressful, and very emotionally damaging over time.

In the VIC office, the essential underlying message, obsessively enforced by Ms Aragon, is that everyone is allowed to have self-esteem except for Ms Greene. Her co-workers did not speak to her for days, her personal items were turned upside down, her food had bleach in in, someone

put small metal screws in her honey jar, when Ms Greene placed personal items in the bathroom everyone with personal items close to hers relocated their personal items. One email from Ms Aragon is subtle, but it says it all: "Everyone has been trained in simpleview software" and then "Shannon has not yet been trained"; as though Ms Greene is not part of Everyone. Exhibit 65 #peer-to-peer hostility and Ms Aragon

Ms Greene got written up for not writing that "200 minus 200 is 0" on a POS form but Ms Hiltibran made the identical error (see exhibit) and was not written up; and Ms Rogers did not even place her name or the date on the same form and was not written up. Ms Colleen Cullen forgot to log many thousands of brochures (see exhibit) and was not reprimanded. No one was reprimanded for a $205 mistake, but Ms Greene was "interrogated" in multiple meetings over a missing $3 that anyone could have taken. Ms Colleen Cullen forgot to lock 3 doors overnight and for no reason, Ms Greene was blamed, and multiple meetings were held with Ms Greene, none of which Ms Cullen attended. In the attached exhibit, only a small portion of the enormous numbers of VIC errors are shown. However, Ms Aragon focuses almost exclusively, as the data shows, on Ms Greene's errors, which are rare and are usually minutiae, while ignoring enormous errors by her co-workers . These daily rebukes are humiliating. Exhibit 73 #Small Retaliation Another Small Retaliation is Isolation: Ms Greene is not permitted to attend Member Conversations, an opportunity to meet people from other departments. Exhibit 82 #Isolation

### Ms Greene's Personality: the City attempts to Blame Ms Greene for Their EEO Violations

The VBPD assessed Ms Greene's personality and chose 2 character references that best describe "who she is." Exhibit 83 #VBPD Character References for SG Some of Ms Greene's co-workers and others wrote very positive letters of recommendation about her. Exhibit 88 #Letters of Rec-City of VB co-workers The City has claims that Ms Greene can't get along with people, writes too long emails, etc. Ms Greene usually writes short, friendly, efficient emails to everyone; but longer emails became necessary in this matter. The VBPD City psychologist gave Ms Greene a passing score. The VBPD themselves found: Ms Greene is "honest and straighforward," "likes many people," "seems to bond with most people," and "treats everyone with dignity and respect." Exhibit 83 #VBPD Character References for SG The VBPD chose these comments among many as "constituent" traits. The VBPD also found that Ms Greene is humble and serves others. Comments about Ms Greene in CVB emails follow illegal "sex stereotyping" patterns, such as attributions (with no basis) of hysteria and oversensitivity, which would likely not be used to describe male Police Officer Recruits or employees in general who are men.

### Promotions

All four major players in the retaliation, bullying, suppression of evidence, and improper investigations all received promotions, and supported each other for their promotions. Exhibit 64

#Promotions There was no correction; there was an expansion of discrimination.

Discrimination is not a victim-less crime. The ongoing discrimination and retaliation have been, and continue to be, frightening, humiliating, sexually humiliating, emotionally destructive, degrading, embarrassing, dangerous, destructive to reputation, promotion, and career advancement, and destructive in many other ways.

- **Relief**

Please enter a judment for compensatory damages, expectation damages, consequential damages, general damages, liquidated damages, lost earning capacity, equitable damages, appropriately assessed damages for emotional distress, punitive damages, restitutionary damages, aggravated damages, and all damages available under the law to be assessed at $35 million, or more as the Law provides, in favor of the Plaintiff.

Defendant's actions directly and proximately caused Plaintiff Greene to suffer loss of income and benefits, injury, aggravation of injuries, extreme pain, extreme emotional distress, profound emotional suffering, stress, sexual humiliation, damaged professional reputation, loss of enjoyment of life, mental anguish, and further loss of future professional opportunities.

Please issue a declaratory judgment that Defendant violated even the most basic rights of citizens afforded under 42 USC 1981.

If it pleases the Court, please issue a declaratory judgment that the unlawful employment practices by the City of VB were intentional, reckless, depraved, and relentless, and appeared to entail significant cooperation and planning.

Please grant a permanent injunction enjoining the Defendant, its officers, agents, employees, and attorneys from engaging in discrimination and assault and battery of any future employee. Please make a statement to other women previously employed by the City of Virginia Beach who may have suffered similar conditions but were not able to survive retaliation.

Please grant such further relief as the Court deems necessary and proper in the public interest.

Please enter a judgment for compensatory damages and/or fees expended herein, including compensation for time (approx. 120 hours per month) expended by Plaintiff from December of 2015 to March of 2019 in preparing grievances and other opposition to sex discrimination at Plaintiff's previous salary of approx. $255.00/hour for work of comparable complexity and loss of enjoyment of life.

In the calculation of litigation costs please note that the Plaintiff is in no way capable of paying opposing side's attorney's fees in whole or in part.

Please order the removal of the P.I.P. disciplinary action from Ms Greene's permanent record as promised but not fulfilled by the City of VB. Please order the removal of Mr Kaufman's Background Investigation Report from Ms Greene's permanent file, and let Mr Irving's report stand as the only Background Investigation Report of Ms Greene. If it pleases the Court, please order a written apology to Ms Greene from the City of VB to be stated in her permanent record.

- **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 5-20-19

Signature of Plaintiff _Shannon U. Greene_

Printed Name of Plaintiff _Shannon K Greene_